Present:  Keenan, Koontz, Kinser, Lemons, Goodwyn, and Millette, JJ. and Russell, S.J.

VOLKSWAGEN OF AMERICA, INC.

                                        OPINION BY
v.  Record No. 082305       JUSTICE LAWRENCE L. KOONTZ, JR.
                                     February 25, 2010
DEMERST B. SMIT, COMMISSIONER
OF THE VIRGINIA DEPARTMENT OF
MOTOR VEHICLES, ET AL.

              FROM THE COURT OF APPEALS OF VIRGINIA

     In a prior appeal, this Court reversed a decision of the

Commissioner of the Virginia Department of Motor Vehicles

("DMV") finding that, during the period of October 1997

through March 1998, Volkswagen of America, Inc. ("Volkswagen")

violated Code § 46.2-1569(7) when it failed to supply certain

high-demand models of vehicles imported by Volkswagen for

distribution to its franchise dealers in the United States to

Miller Auto Sales, Inc. ("Miller Auto"), a Volkswagen

franchise dealer in Winchester.  Volkswagen of America, Inc.

v. Smit, 266 Va. 444, 453-54, 587 S.E.2d 526, 531-32 (2003)

(hereinafter, "Volkswagen II").  That appeal arose from a

judgment of the Court of Appeals of Virginia, which had

affirmed an order of the Circuit Court of the City of Richmond

upholding the Commissioner's decision.  Volkswagen of America,

Inc. v. Quillian, 39 Va. App. 35, 69, 569 S.E.2d 744, 761

(2002) (hereinafter, "Volkswagen I").  In reversing the

judgment of the Court of Appeals, we held that the

Commissioner had erroneously interpreted Code § 46.2-1569(7) and consequently improperly focused on the business judgment of Volkswagen, rather than limiting the inquiry to the relevant factors prescribed by the statute. Volkswagen II, 266 Va. at 453-54, 587 S.E.2d at 531-32. We also vacated that portion of the Court of Appeals' decision in Volkswagen I that addressed Volkswagen's challenge to Code § 46.2-1569(7) alleging both that the statute violates principles of the dormant Commerce Clause of the United States Constitution and is unconstitutionally vague in violation of the Due Process Clauses of the United States and Virginia Constitutions. Id. at 454, 587 S.E.2d at 532 (citing the established principle of constitutional law that a court will not rule upon the constitutionality of a statute unless such a determination is absolutely necessary to decide the merits of the case); see Klarfeld v. Salsbury, 233 Va. 277, 286, 355 S.E.2d 319, 324 (1987).

Following the remand to the DMV and further proceedings before the Commissioner, Volkswagen was again found to have violated Code § 46.2-1569(7). This decision was appealed again through the circuit court and the Court of Appeals, with Volkswagen renewing its constitutional challenges to the statute, as well as contesting the Commissioner's decision on the merits. Upon appeal from the decision of the circuit

2

court, the Court of Appeals, Volkswagen of America, Inc. v. Smit, 52 Va. App. 751, 799, 667 S.E.2d 817, 841 (2008) (hereinafter, "Volkswagen III"), affirmed the Commissioner's decision.  In doing so, the Court of Appeals affirmed the circuit court's holding that Code § 46.2-1569(7) was neither void for vagueness nor violative of dormant Commerce Clause principles.  Id. at 795, 799, 667 S.E.2d at 839, 841.

Volkswagen appealed the judgment of the Court of Appeals by petition to this Court, challenging both the decision upholding the Commissioner's finding that its actions violated Code § 46.2-1569(7) and the determination that the statute was not constitutionally infirm.  By an order dated April 14, 2009, we awarded Volkswagen this appeal limited to the dormant Commerce Clause and due process issues.

BACKGROUND

Because we have previously given extensive recitation to the factual and procedural background of this case in Volkswagen II, 266 Va. at 447-51, 587 S.E.2d at 528-30, and the issues in this appeal address only the Commerce Clause and due process challenges to the statute at issue, we will limit our recitation of the facts to those necessary to resolve the appeal upon the issues presented.

As relevant to the time at which its dispute with Miller Auto arose, Volkswagen imported vehicles from Volkswagen AG,

3

its German parent corporation, and distributed them to approximately 600 franchise dealers in the United States, including its dealers in Virginia. For vehicle models for which demand exceeded supply, Volkswagen used a national allocation procedure to distribute vehicles to its dealers based on a mathematical algorithm to determine a "Dealer Allocation Percentage" designed to deliver vehicles where they were most likely to be sold and where they were most needed because of low inventory. Volkswagen's "Area Executives" were given the authority to adjust the algorithm's results for each dealer within the executive's geographic region based on various factors, including a dealer's customer satisfaction survey scores, local market conditions, and minimum stocking requirements of the dealer's franchise agreement.

Miller Auto was the lowest volume dealer among Volkswagen's dealers in its dealer sales district, which included seven Volkswagen dealers in northern Virginia as well as four dealers in Maryland and one in Washington, D.C. During 1997, for example, Miller Auto sold 47 new Volkswagens of all models, while during the same period the two largest Volkswagen dealers in Virginia each sold over 1000 new Volkswagens of all models. Miller Auto, which had franchise agreements for several other automobile lines, concedes that

4

sales of all models supplied by Volkswagen accounted for only approximately ten percent of its sales volume.

In the period immediately preceding the dispute between Volkswagen and Miller Auto, the supply of all the models in Volkswagen's line of vehicles available for distribution to dealers generally exceeded demand and, thus, it was not necessary for Volkswagen to use the dealer allocation percentage to determine how many vehicles a particular dealer was entitled to receive. However, in the fall of 1997, Volkswagen introduced a new 1998 model of the Passat and in early 1998 introduced the New Beetle model. Because demand for these vehicles initially far exceeded supply, Volkswagen used the national allocation procedure to determine how many of these vehicles its dealers were entitled to receive.

It is not disputed that during the period of October 1997 to March 1998 Volkswagen imported 18,454 Passats, and during the period of February to March 1998 Volkswagen imported 5,637 New Beetles. Miller Auto requested delivery from Volkswagen of one or more 1998 Passats and New Beetles during those respective timeframes, but received no shipments of either vehicle until after March 1998.[1] While it is also not disputed

---

[1] Miller Auto received delivery of one Passat in December 1997, apparently by transfer from another dealer, and it was not clear whether this vehicle was a 1998 or earlier model.

5

by Miller Auto that the demand for Passats and New Beetles during the relevant timeframes exceeded the available supply, there is no conclusive evidence in the record as to actual level of national dealership demand, either as to the number of dealers requesting delivery of the two vehicle models or of the total number of vehicles requested by all dealers.

On February 9, 1998, John C. Miller, Vice President of Miller Auto, advised Volkswagen by letter that Miller Auto was dissatisfied with the manner in which new vehicles were being allocated to it. Miller expressly stated his belief that Volkswagen's allocation procedure violated Code § 46.2-1569(7). Miller sent a copy of this letter to the DMV.

As relevant to Miller's compliant, Code § 46.2-1569(7) provides that:

> Notwithstanding the terms of any franchise agreement, it shall be unlawful for any [motor vehicle] manufacturer, factory branch, distributor, or distributor branch, or any field representative, officer, agent, or their representatives:
>
> . . . .
>
> 7. To fail to ship monthly to any dealer, if ordered by the dealer, the number of new vehicles of

---

In any case, the delivery of this one vehicle was not germane to the Commissioner's ultimate determination that Volkswagen had violated Code § 46.2-1569(7), nor is it relevant to our resolution of the issues raised in this appeal, since the Commissioner determined that this vehicle was not delivered by Volkswagen.

6

each make, series, and model needed by the dealer to receive a percentage of total new vehicle sales of each make, series, and model <u>equitably related to the total new vehicle production or importation currently being achieved nationally by each make, series, and model covered under the franchise</u>.

(Emphasis added.)[2]

After mediation of the dispute between Miller Auto and Volkswagen pursuant to Code § 46.2-1572.2 proved fruitless, the Commissioner instituted formal proceedings against Volkswagen. As indicated above, those proceedings resulted in a determination by the Commissioner that Volkswagen had violated Code § 46.2-1569(7), but that this Court overturned that determination in <u>Volkswagen II</u>.

Upon remand, the record was not substantially enlarged as to any relevant factor. The Commissioner again determined, based upon his interpretation of what level of distribution of the two vehicle models at issue would be "equitably related to the total new vehicle production or importation currently being achieved nationally," that Volkswagen had violated Code § 46.2-1569(7) with respect to its dealings with Miller Auto. Specifically, the Commissioner found that regardless of the

---

[2] Nearly identical language to that in Code § 46.2-1569(7) also appears in Code § 46.2-1976(9), relating to distribution of motor homes and travel trailers, Code § 46.2-1992.69(9), relating to distribution of other types of trailers, and Code § 46.2-1993.67(9), relating to the distribution of motorcycles.

methodology used to allocate vehicles among dealers, the "allocation[] of zero vehicles [to a dealer] of a certain make, series, or model for one or more months would not be equitable." The Commissioner expressly limited his finding to the facts of this case where the requested vehicle was a new model and "where no meaningful history of dealer or national sales exist for the new vehicle." However, the Commissioner concluded that there was no specific statutory sanction provided for such violation and, that in any case, given the length of time since the violation, and because Volkswagen was no longer using the relevant allocation procedures and "there was no evidence presented at the hearing to indicate that Volkswagen was currently in violation of any of the provisions contained within Title 46.2," the Commissioner determined that no sanction against Volkswagen was warranted.

Both the circuit court and subsequently the Court of Appeals in Volkswagen III gave a thorough analysis of the Commerce Clause and due process challenges to the application of Code § 46.2-1569(7) raised by Volkswagen in appealing the Commissioner's determination. Because this Court will review these questions of law de novo, it is not necessary to recount here the analysis that each court used to determine that the statute was not unconstitutional. See Appalachian Voices v. State Corp. Comm'n, 277 Va. 509, 516, 675 S.E.2d 458, 461

8

(2009)(constitutional arguments are questions of law that this Court reviews de novo).

DISCUSSION

Our review of Volkswagen's challenge to the application of Code § 46.2-1569(7) in this case begins with the well established principle that duly enacted laws are presumed to be constitutional. Tanner v. City of Virginia Beach, 277 Va. 432, 438, 674 S.E.2d 848, 852 (2009). "We are required to resolve any reasonable doubt concerning the constitutionality of a law in favor of its validity. Thus, if a statute or ordinance can be construed reasonably in a manner that will render its terms definite and sufficient, such an interpretation is required." Id. at 438-39, 674 S.E.2d at 852 (citations omitted). "Nevertheless, construing statutes to cure constitutional deficiencies is allowed only when such construction is reasonable. A statute cannot be rewritten to bring it within constitutional requirements." Jaynes v. Commonwealth, 276 Va. 443, 464, 666 S.E.2d 303, 314 (2008) (citation omitted).

Because our jurisprudence favors upholding the constitutionality of properly enacted laws, we have recognized that it is possible for a statute or ordinance to be facially valid, and yet unconstitutional as applied in a particular case. See, e.g., Cochran v. Fairfax County Bd. of Zoning

9

_Appeals_, 267 Va. 756, 764, 594 S.E.2d 571, 576 (2004); see also _Boddie v. Connecticut_, 401 U.S. 371, 379 (1971)("a statute . . . may be held constitutionally invalid as applied . . . although its general validity as a measure enacted in the legitimate exercise of state power is beyond question"). "The 'usual judicial practice' is to address an as-applied challenge before a facial challenge because it generally will be more 'efficien[t],' because this sequencing decreases the odds that facial attacks will be addressed 'unnecessarily' and because this approach avoids encouraging 'gratuitous wholesale attacks upon state and federal laws.' " _Connection Distrib. Co. v. Holder_, 557 F.3d 321, 327-28 (6th Cir. 2009) (quoting _Board of Trustees of the State Univ. of N.Y. v. Fox_, 492 U.S. 469, 484-85 (1989); see also _Mahan v. National Conservative Political Action Committee_, 227 Va. 330, 340, 315 S.E.2d 829, 835 (1984) (upholding declaratory judgment that facially valid statute was nonetheless unconstitutional as applied).

" '[V]agueness challenges to statutes not threatening First Amendment interests are examined in light of the facts of the case at hand; the statute is judged on an as-applied basis.' " _Motley v. Virginia State Bar_, 260 Va. 243, 247, 536

S.E.2d 97, 99 (2000) (quoting Maynard v. Cartwright, 486 U.S. 356, 361 (1988)). As we observed in Volkswagen II, a court should not declare a statute to be wholly unconstitutional "unless such a determination is absolutely necessary to decide the merits of the case." 266 Va. at 454, 587 S.E.2d at 532. Thus, Volkswagen's due process challenge does not require us to determine whether Code § 46.2-1569(7) is facially invalid if we determine that the statute is constitutionally infirm as applied on the facts of this case. Accordingly, we will first consider Volkswagen's assertion that Code § 46.2-1569(7) as applied by the Commissioner in this case violated due process because the statute is impermissibly vague in that the statute failed to provide adequate notice to Volkswagen as to what conduct it prohibits.

In Tanner, we explained that "[t]he constitutional prohibition against vagueness derives from the requirement of fair notice embodied in the Due Process Clause[s]" of the United States and Virginia Constitutions. 277 Va. at 439, 674 S.E.2d at 852. Due process requires that a statute be sufficiently precise and definite to give fair warning to those who are subject to it what the statute prohibits and what is expected of them by the state. Id. "The constitutional prohibition against vagueness also protects

11

citizens from the arbitrary and discriminatory enforcement of laws."  Id.

Thus, there are two, independent ways in which a statute can be impermissibly vague. "First, if it fails to provide people of ordinary intelligence a reasonable opportunity to understand what conduct it prohibits.  Second, if it authorizes or even encourages arbitrary and discriminatory enforcement."  Hill v. Colorado, 530 U.S. 703, 732 (2000); see Village of Hoffman Estates v. Flipside, Hoffman Estates, Inc., 455 U.S. 489, 498 (1982); Greenville Women's Clinic v. S.C. Dep't of Health, 317 F.3d 357, 366 (4th Cir. 2002).  A vague statute violates the "important values" of fair notice to citizens and the prevention of arbitrary enforcement. Hoffman, 455 U.S. at 498.

"[A]n ordinance that lacks meticulous specificity nevertheless may survive a vagueness challenge if the ordinance as a whole makes clear what is prohibited."  Tanner, 277 Va. at 439, 674 S.E.2d at 852.  "Because legislative bodies are '[c]ondemned to the use of words,' courts cannot require 'mathematical certainty' in the drafting of legislation."  Id. (quoting Grayned v. City of Rockford, 408 U.S. 104, 110 (1972)).  Accordingly, a statute may survive a vagueness challenge if the language used by the legislature

12

makes clear what the statute prohibits and what is required in order to comply with the law.  Id.

Volkswagen contends that the language of Code § 46.2-1569(7) as applied by the Commissioner in this case is impermissibly vague because neither the statute nor any formal or informal administrative action provided Volkswagen with fair notice that it was prohibited from failing to deliver at least one vehicle of any model requested by a franchise dealer in any given month based solely on a mathematical determination that the number of vehicles it imported during that month equaled or exceeded the total number of its dealers eligible to make such a request.  In the absence of any clear guidance within the statute or through regulation or guidance provided by the Commissioner, Volkswagen contends that the determination of compliance with the statute in any given case would depend solely on an arbitrary determination by the Commissioner of what is "equitable" after the fact.

Volkswagen notes that Code § 46.2-203 empowers the Commissioner to adopt "reasonable administrative regulations necessary to carry out the laws administered by the [DMV]," but that no regulations have been promulgated by the Commissioner to provide guidance to manufacturers and distributors as to the proper determination of the equitable relationship between total production and importation and the

13

right of an individual dealer to request delivery of a specific make and model of a vehicle. Nor has the Commissioner provided any "guidance documents" on the application of the statute as permitted under Code § 2.2-4001 et seq.

On the specific facts of this case, Volkswagen contends that nothing in Code § 46.2-1569(7), as interpreted by the Commissioner, provides a manufacturer or distributor with notice that it was prohibited from failing to supply every dealer who requested delivery of a particular newly introduced model of a vehicle with at least one vehicle in any month that the national production or importation of that model equaled or exceeded the total number of dealers requesting delivery of one or more vehicles, without regard to any other factor. Noting that the Commissioner expressly limited this finding to newly introduced models, declining to express any opinion on how the statute would apply "where there is reliable data regarding sales histories for particular vehicles," Volkswagen contends that the Commissioner created an arbitrary standard for the "equitable" delivery of new vehicle models that could not have been gleaned from the language of the statute and, thus, Volkswagen was without notice that its failure to supply Miller Auto with a least one of each of the requested vehicles

14

in any given month would render it in violation of Code § 46.2-1569(7).

There is nothing inherently vague in a statutory requirement that an act be performed "equitably." Indeed, such a standard has been enacted by the General Assembly to address a variety of circumstances in order to effectively accomplish the purpose of a particular statute.[3]

---

[3] See, e.g., Code § 2.2-219(D) (directing the Secretary of Natural Resources to "equitably allocate" credits for nutrient reductions in water quality control plans); Code § 2.2-4605(A)(1)(d) (requiring the Treasury Board to equitably apportion gains and losses among participants in local government investment pools); Code § 15.2-1636.19 (empowering the Compensation Board to equitably determine disputes concerning compensation of deputies and allocation of funds arising from a change in constitutional officers); Code § 19.2-386.14(C) (permitting the Criminal Justice Services

Board to equitably distribute forfeited property to eligible participating agencies); Code § 20-49.8(A) (permitting a court to equitably apportion unpaid expenses of a paternity proceeding); Code § 23-30.42(j) (authorizing the Virginia College Building Authority to equitably apportion expenses for its operation among participating institutions); Code § 32.1-299(A)(2) (requiring distribution of cadavers donated for scientific study equitably among health education institutions).

And, as the Commissioner correctly asserts on brief in this appeal, we have recognized that "a statute is not fatally indefinite because questions may arise as to its applicability, or opinions may differ with respect to what falls within its terms, or because it is difficult to enforce." Fallon Florist, Inc. v. City of Roanoke, 190 Va. 564, 590, 58 S.E.2d 316, 329 (1950).

Nonetheless, we agree with Volkswagen that, as applied by the Commissioner in this case, the requirement of Code § 46.2-1569(7) that Miller Auto was to receive delivery of 1998 Passats and New Beetles in a volume "equitably related to the total new vehicle production or importation currently being achieved nationally" is impermissibly vague. Neither the statute nor any administrative regulation or guidance promulgated by the Commissioner provided Volkswagen with notice that if the number of vehicles available in a given month was equal to or greater than the number of dealers making requests, it was prohibited from failing to deliver to Miller Auto at least one of each model of vehicle requested without regard to any other factors that might impact the determination of the number of vehicles the dealer would otherwise be entitled to receive.

A statute, ordinance, or regulation which delegates discretionary authority to an administrative officer to

determine its application does not satisfy due process if it lacks standards which are sufficiently clear to guide the officer, and inform those subject to his jurisdiction, of how that discretion is to be exercised.   See, e.g., Chapel v. Commonwealth, 197 Va. 406, 415, 89 S.E.2d 337, 343 (1955); cf. City of Waynesboro v. Keiser, 213 Va. 229, 233-34, 191 S.E.2d 196, 199 (1972) (holding that a statute permitting a court to adjust property tax assessments "in its discretion" was "vague and overbroad [because it] provides no guidelines or standards for decision").   In Chapel, we held that the Dry Cleaners Act impermissibly delegated discretionary authority to the State Dry Cleaners Board "without fixing any standard or test to guide and control the exercise of such discretion."   197 Va. at 415, 89 S.E.2d at 343.   As we said in Chapel:

> "It is a fundamental principle of our system of government that the rights of men are to be determined by the law itself, and not by the let or leave of administrative officers or bureaus.  This principle ought not to be surrendered for convenience or in effect nullified for the sake of expediency.  It is the prerogative and function of the legislative branch of the government, whether State or municipal, to determine and declare what the law shall be, and the legislative branch of the government may not divest itself of this function or delegate it to executive or administrative officers."

197 Va. at 410, 89 S.E.2d at 340 (quoting Thompson v. Smith, 155 Va. 367, 379, 154 S.E. 579, 584 (1930)).

We have recognized that the legislature may delegate discretion to an administrative officer to determine the specifics of how a statute is to be enforced, but " '[t]he legislature must declare the policy of the law and fix the legal principles which are to control in given cases.' " Thompson, 155 Va. at 381, 154 S.E. at 584 (quoting Mutual Film Corp. v. Ohio Industrial Commission, 236 U.S. 230, 239 (1915)). Of course, the legislature is not required to delve into the minutiae of the standards to be applied in every case, but may delegate to the administrative body rulemaking authority to set specific procedures for applying the general standards established by the laws the body is charged with enforcing "so long as the rules it adopts are not inconsistent with the authority of the statutes that govern it or with principles of due process." Judicial Inquiry & Review Commission v. Elliott, 272 Va. 97, 115, 630 S.E.2d 485, 494 (2006); see also Sargent Elec. Co. v. Woodall, 228 Va. 419, 424, 323 S.E.2d 102, 105 (1984). In short, the requirement of fair notice contained in due process is not satisfied if the public cannot determine what the law prohibits or the standard to which they must conform from either the language of the statute or a properly promulgated regulation or other official guidance provided prior to the statute being enforced, but rather only after the fact from the result of an arbitrary

19

exercise of discretion by the administrative official charged with enforcing the statute.

In this case, the Commissioner stated that he used "basic mathematics to analyze whether an allocation of zero vehicles would satisfy the statutory requirement" to "equitably" allocate newly introduced models of vehicles to determine whether a manufacturer or distributor is in compliance with the provisions of Code § 46.2-1569(7). As an example, the Commissioner noted "that in December of 1997, for instance, sufficient numbers of Passats were imported into the U.S. to allow each U.S. dealer to receive allocations or shipments of approximately 8 Passats." The Commissioner concluded that the this "[s]imple division" supported his conclusion that Code § 46.2-1569(7) prohibited Volkswagen from failing to ship at least one Passat to Miller Auto from that month's importations.

However, the issue before this Court is not whether "simple mathematics" demonstrates that Volkswagen could have shipped at least one of each model to Miller Auto, but rather whether Code § 46.2-1569(7) provided Volkswagen with adequate notice that the statute prohibited Volkswagen from failing to ship at least one of each model to Miller Auto if it were otherwise capable of doing so. When viewed in this light, the Commissioner's use of "basic mathematics" is clearly not a

20

standard that is prescribed by the language of the statute. Nor is it a standard clearly enunciated in a regulation or other form of guidance promulgated by the Commissioner. Accordingly, under the facts of this case, we conclude that during the period of October 1997 through March 1998 Volkswagen could not reasonably have understood from the language of the statute that its failure to ship any newly introduced Passats and New Beetles to Miller Auto would violate Code § 46.2-1569(7), but learned this only after the fact from the result of an arbitrary exercise of discretion by the administrative official charged with enforcing the statute.

In the absence of fair notice from the language of the statute or that the Commissioner would interpret the statute as prohibiting it from not shipping at least one of each requested vehicle model to Miller Auto in any month that it was capable of doing so, Volkswagen was denied its right to due process. Thus, we hold that Code § 46.2-1569(7) is impermissibly vague as applied in this case, and the Commissioner's finding that Volkswagen was in violation of that statute must be set aside.

As in Volkswagen II, we conclude that because the merits of Volkswagen's appeal can be decided on the narrower basis of an "as applied" challenge to the statute under due process, it

21

is not necessary to consider Volkswagen's facial challenge to the statute based on either vagueness or dormant Commerce Clause principles.  266 Va. at 454, 587 S.E.2d at 532. Therefore, we again will vacate that portion of the Court of Appeals' judgment holding that Code § 46.2-1569(7) does not violate the Commerce Clause of the United States Constitution. See id.

CONCLUSION

For these reasons, we will vacate that portion of the Court of Appeals' judgment addressing the Commerce Clause issue, reverse the judgment of the Court of Appeals affirming the Commissioner's finding that Volkswagen violated Code § 46.2-1569(7), and enter final judgment here for Volkswagen.

Reversed in part,
vacated in part,
and final judgment.

JUSTICE KINSER, with whom JUSTICE LEMONS and SENIOR JUSTICE RUSSELL join, dissenting.

Today, the majority holds that "Code § 46.2-1569(7) [(the Statute)] is impermissibly vague as applied in this case." That holding, in my view, is based on a flawed analysis that flows from the majority's asking the wrong question.  The majority repeatedly inquires whether the Statute, or any administrative regulation or guidance promulgated by the Commissioner of the Virginia Department of Motor Vehicles

22

(Commissioner), provided Volkswagen of America, Inc.

(Volkswagen)

> with notice that if the number of vehicles available in a given month was equal to or greater than the number of dealers making requests, it was prohibited from failing to deliver to Miller Auto at least one of each model of vehicle requested without regard to any other factors that might impact the determination of the number of vehicles the dealer would otherwise be entitled to receive.

The appropriate question for an as-applied analysis, however, is whether the provisions of Code § 46.2-1569(7) gave Volkswagen fair warning that shipping zero Passats and zero New Beetles to Miller Auto Sales, Inc. (Miller Auto) during the period in question was not "equitably related" to the 18,454 Passats and the 5,637 New Beetles Volkswagen imported for distribution among 600 franchise dealers. Code § 46.2-1569(7). Focusing on whether Volkswagen was "otherwise capable of" shipping at least one Passat and one New Beetle to Miller Auto during the months in question, the majority purports to conduct an as-applied analysis; however, it fails to do so because it never examines the Statute in light of the facts of this case. By asking the wrong question, the

majority, in my view, reaches the wrong answer.  Thus, I

respectfully dissent.[1]

## I. VAGUENESS CHALLENGE

As this Court has stated, "duly enacted laws are presumed

to be constitutional" and "any reasonable doubt concerning the

constitutionality of a law" should be resolved "in favor of

its validity."  Tanner v. City of Virginia Beach, 277 Va. 432,

438, 674 S.E.2d 848, 852 (2009).  There is even greater

deference for duly enacted economic regulations, which are

subject to "a less strict vagueness test because [their]

subject matter is often more narrow, and because businesses

. . . can be expected to consult relevant legislation in

advance of action."  Village of Hoffman Estates v. Flipside,

Hoffman Estates, Inc., 455 U.S. 489, 498 (1982).  In addition,

"the regulated enterprise may have the ability to clarify the

meaning of the regulation by its own inquiry, or by resort to

an administrative process."  Id.  There is also a "greater

tolerance of enactments with civil rather than criminal

penalties because the consequences of imprecision are

qualitatively less severe."  Id. at 498-99.  For these

---

[1] Unlike the majority, I must address not only
Volkswagen's claim that the Statute is impermissibly vague
under the Due Process Clause but also its assertion that the
Statute violates the dormant Commerce Clause.  I will address
the issues in that order.

24

reasons, a due process vagueness challenge to an economic regulation is " 'examined in light of the facts of the case at hand; the statute is judged on an as-applied basis.' " _Motley v. Virginia State Bar_, 260 Va. 243, 247, 536 S.E.2d 97, 99 (2000) (quoting _Maynard v. Cartwright_, 486 U.S. 356, 361 (1988)).

In _Hoffman_, the Supreme Court of the United States explained:

> "One to whose conduct a statute clearly applies may not successfully challenge it for vagueness." . . . [T]o sustain such a challenge, the complainant must prove that the enactment is vague " 'not in the sense that it requires a person to conform his conduct to an imprecise but comprehensive normative standard, but rather in the sense that no standard of conduct is specified at all.' Such a provision simply has _no_ core."

_Hoffman_, 455 U.S. at 495 n.7 (quoting _Parker v. Levy_, 417 U.S. 733, 756 (1974); _Smith v. Goguen_, 415 U.S. 566, 578 (1974)) (internal citations omitted).

There are two independent ways in which a statute may be impermissibly vague. "First, if it fails to provide people of ordinary intelligence a reasonable opportunity to understand what conduct it prohibits. Second, if it authorizes or even encourages arbitrary and discriminatory enforcement." _Hill v. Colorado_, 530 U.S. 703, 732 (2000); accord _Hoffman_, 455 U.S. at 498; _Greenville Women's Clinic v. Commissioner, South_

25

Carolina Dep't of Health, 317 F.3d 357, 366 (4th Cir. 2002) (quoting Hill, 530 U.S. at 732).[2]  Thus, a vague statute violates the "important values" of fair notice to citizens and the prevention of arbitrary enforcement.  Hoffman, 455 U.S. at 498.

"[A]n ordinance that lacks meticulous specificity nevertheless may survive a vagueness challenge if the ordinance as a whole makes clear what is prohibited."  Tanner, 277 Va. at 439, 674 S.E.2d at 852; see also Hoffman, 455 U.S. at 503 (determining whether a "business regulation" afforded "fair warning of what is proscribed"); Ford Motor Co. v. Texas Dep't of Transp., 264 F.3d 493, 509 (5th Cir. 2001) ("Ford knew . . . it was prohibited from selling automobiles and it had fair notice that its conduct may violate [the statute.]"); Chalmers v. City of Los Angeles, 762 F.2d 753, 757–58 (9th Cir. 1985) ("[V]agueness analysis still applies to [economic] regulation [and 't]he principal inquiry is whether the law affords fair warning of what is proscribed.' ") (citation omitted); United States v. Sun & Sand Imp., Ltd., 725 F.2d 184, 187 (2d Cir. 1984) (stating that a statute dealing with

_____

[2] This standard for judging vagueness applies irrespective of the type of enactment being challenged.  Compare Hill, 530 U.S. at 732 (applying the test of fair warning and arbitrary enforcement to a speech regulation) with Hoffman, 455 U.S. at

economic activity is vague if "it gives no warning to the challenger that his conduct is prohibited"); Trans Union Corp. v. Federal Trade Comm'n, 245 F.3d 809, 817 (D.C. Cir. 2001) (same); Irvine v. 233 Skydeck, LLC, 597 F. Supp. 2d 799, 802 (N.D. Ill. 2009) (same); Secretary, Vermont Agency of Natural Res. v. Irish, 738 A.2d 571, 575-76 (Vt. 1999) (same).

In asking whether the Statute gave fair notice to Volkswagen as to what conduct was prohibited, the majority purports to conduct an as-applied analysis. But, in my view, the majority actually fails to examine the Statute " 'in light of the facts of the case at hand.' " Motley, 260 Va. at 247 (quoting Maynard, 486 U.S. at 361). Because both vehicles at issue in this case were newly introduced models, meaning no dealer and/or national sales data was available for either vehicle, there are two determinative questions in judging the Statute on an as-applied basis as to whether it gave Volkswagen fair notice of what conduct was prohibited. The majority never answers these questions. Did the Statute give fair warning that shipping zero vehicles to Miller Auto was not equitably related to the 18,454 Passats and 5,637 New Beetles Volkswagen imported for distribution to 600 dealers such that Volkswagen's conduct was prohibited? And, as

_____

498 (applying the same test to an "economic regulation,"

applied in this case, did the Statute authorize arbitrary or discriminatory enforcement by the Commissioner?

The question is not whether Volkswagen knew it was prohibited from sending Miller zero Passats and zero New Beetles simply because it had imported enough to send each of its dealers at least one of both models. If Volkswagen's conduct in sending zero vehicles in the limited circumstances before the Court was " 'clearly proscribed[, it] cannot complain of the vagueness of the law as applied to the conduct of others.' " Shivaee v. Commonwealth, 270 Va. 112, 125, 613 S.E.2d 570, 577 (2005) (quoting Commonwealth v. Hicks, 267 Va. 573, 580-81, 596 S.E.2d 74, 78 (2004)); see United States v. Raines, 362 U.S. 17, 21 (1960).[3] Volkswagen must show that, as applied to the facts of this case, the Statute specified " 'no standard of conduct . . . at all.' " Hoffman, 455 U.S. at 495 n.7 (quoting Goguen, 415 U.S. at 578).

Although there are few facts in this case relevant to whether Code § 46.2-1569(7) is vague as applied, three facts are decisive to the vagueness challenge before us: the number

_____

though "less strict[ly]").

[3] For these reasons, the multiple hypotheticals that Volkswagen presents in its brief are immaterial to the question at hand. See Shivaee, 270 Va. at 125, 613 S.E.2d at 577 (noting that a court should examine a complainant's conduct before analyzing hypothetical applications of the law at issue).

of 1998 Passats and New Beetles Volkswagen imported nationally during the months at issue, the number of such vehicles shipped to Miller Auto during the relevant period, and the number of Volkswagen dealers in the United States at that time.  From October 1997 to March 1998, Volkswagen imported 18,454 Passats and gave Miller Auto zero.  In February and March 1998, Volkswagen imported 5,637 New Beetles and sent Miller Auto zero.  Volkswagen had 600 franchise dealers in the United States during that time frame.

Although the majority mentions these facts, it does not actually incorporate them into its purported as-applied analysis.  By repeatedly focusing on whether the Statute gave notice to Volkswagen that it was prohibited from failing to ship at least one vehicle of each model to Miller Auto "if it were otherwise capable of doing so" or "without regard to any other factors," the majority uses a legal test that the Statute does not contain.  For the majority to apply that test, it constructs a hypothetical situation instead of examining the actual facts of this case.  The majority's hypothetical, unlike the facts in this case, considers only whether Volkswagen imported enough Passats and New Beetles during the relevant months to give its 600 dealers at least one vehicle of each model.  Given the number of Passats and New Beetles imported during the period in question, Volkswagen

29

was clearly "otherwise capable of" shipping one Passat and one Beetle to each of the 600 dealers.  But, such is not the appropriate question under the terms of the Statute.

The Statute, in relevant part, states:

Notwithstanding the terms of any franchise agreement, it shall be unlawful for any manufacturer [or] distributor [t]o fail to ship monthly to any dealer, if ordered by the dealer, the number of new vehicles of each make, series, and model needed by the dealer to receive a percentage of total new vehicle sales of each make, series and model equitably related to the total new vehicle production or importation currently being achieved nationally by each make, series, and model covered under the franchise.

Code § 46.2-1569(7).  Pursuant to the statutory terms, Volkswagen was thus required to ship, if ordered, the number of 1998 Passats and New Beetles needed by Miller Auto to receive a percentage of new vehicle sales of such vehicles that was "equitably related" to the total number of 1998 Passats and New Beetles that Volkswagen imported nationally.

"Equitable" means "fair to all concerned . . . : without prejudice, favor, or rigor entailing undue hardship." Webster's Third New International Dictionary 769 (1993).  The requirement to do something "equitably" "simply directs and requires that [the required act be done] in such manner as will be just to the parties concerned, under all of the circumstances of the particular case."  Painter v. Painter,

30

320 A.2d 484, 490 (N.J. 1974). The notion of equity is one "understood by lawyer and litigant alike." Id.

General principles of fairness and reasonableness are common in legislation, including legislation regarding vehicle allocation systems. See, e.g., Fla. Stat. Ann. § 320.64(18)-(19) (forbidding allocation system that is "unfair, inequitable, [or] unreasonably discriminatory . . . after considering the equities"); Md. Code Ann., Transp. § 15-208(a),(c) (allocation must be "in reasonable quantities and within a reasonable time"); Mass. Gen. Laws ch. 93B, § 4(c)(3) (same); Mich. Comp. Laws § 445.1574(1)(c) (same); Ohio Rev. Code Ann. § 4517.59(F) (franchisor cannot "unfairly change or amend" allotment of vehicles); Okla. Stat. Tit. 47, § 565(A)(9)(c) (manufacturer must not "unreasonably fail[] or refuse[] to offer" vehicles to dealers); S.C. Stat. § 56-15-40 (3)(a) (allocation must be "in reasonable quantities and within a reasonable time"); Utah Code Ann. § 13-14-201(1)(i) (allocation system must be "fair, reasonable, and equitable"); Wash. Rev. Code § 46.96.185(1)(e) (allocation must be "in reasonable quantities and within a reasonable time").

As the majority concedes, "[t]here is nothing inherently vague in a statutory requirement that an act be performed

31

'equitably.' "[4]  Volkswagen, however, maintains, and the

majority essentially agrees, that the legality of a

manufacturer's or distributor's conduct "hinges solely and

completely on one's view of what is 'equitable.' "  In

criticizing the Commissioner for using "basic mathematics" to

determine whether Volkswagen's allocation of zero Passats and

zero New Beetles to Miller Auto was "equitably related" to the

number of such vehicles imported nationally, the majority

states that "the issue before this Court is not whether

'simple mathematics' demonstrates that Volkswagen could have

shipped at least one of each model to Miller Auto."  I agree

with that statement; the issue is clearly not whether

--------

[4] Indeed, the General Assembly has incorporated an
equitable standard in a variety of statutes.  See, e.g., Code
§ 10.1-707(A)(iii) (requiring the Board of Conservation and
Recreation to "determine the equitable allocation of funds
among participating localities"); Code § 2.2-702(3) (requiring
the Department for the Aging to "assure the equitable
statewide distribution of [programmatic] resources"); Code
§ 2.2-2618(7) (empowering the Commonwealth Attorneys Services
Council to "establish an equitable distribution plan for the
allocation of any funds from public or private sources"); Code
§ 22.1-147 (directing the Board of Education to "provide for
an equitable distribution" of certain funds); Code § 32.1-
299(A)(2) (requiring the State Health Commissioner to
distribute cadavers "equitably to the several colleges and
schools of this Commonwealth").  While the majority recognizes
the presence of the term "equitable" or "equitably" in various
statutes, it fails to explain why the term is
unconstitutionally vague as used in Code § 46.2-1569(7) but
not elsewhere.  Without such an explanation, these and other
such statutes will likely be challenged for vagueness under
the Due Process Clause.

Volkswagen "could have shipped" one Passat and one New Beetle to Miller Auto. (Emphasis added.) The Statute does not require a determination as to how many vehicles Volkswagen could have shipped. Instead, Code § 46.2-1569(7) requires the consideration of what allocation of new vehicles is equitable in relation to the number of produced or imported vehicles nationally.

Using this statutorily required mathematical ratio, an as-applied analysis of whether the Statute is impermissibly vague hinges on the number of vehicles produced or imported in a given case vis-à-vis the number of dealers nationally. For example, determining whether shipping zero vehicles of a particular model was an equitable allotment of that model if Volkswagen had imported only 700 of such vehicles would be more difficult if 600 dealers ordered the particular vehicle. But, the meaning of "equitabl[e]" is much clearer where, as in this case, a manufacturer imported many thousands more vehicles of a particular model than it has dealers. Similarly, it would be a different case entirely if Volkswagen had provided any 1998 Passats and New Beetles to Miller Auto and the question was whether that number was equitably related to the number imported nationally. But, in this case, where Volkswagen had 600 dealers and imported over 18,000 vehicles of one model and over 5,000 of another, it is obvious that

33

zero is not equitably related to the "total new vehicle . . . importation . . . nationally" of such models.  Sending zero of 18,454, and sending zero of 5,637 is not "fair" or "without prejudice [or] favor."  Thus, "as a whole," the Statute "[made] clear what [was] prohibited" in light of the facts of this case.  Tanner, 277 Va. at 439, 674 S.E.2d at 852.  After conceding that "[t]here is nothing inherently vague in a statutory requirement that an act be performed equitably," the majority does not explain why this Statute and its specific requirement that two numbers be "equitably related" is impermissibly vague.

For the same reasons that the Statute makes clear what was prohibited in this case, it also satisfies the second aspect of the vagueness test: it does not authorize or encourage discriminatory or arbitrary enforcement.  During the relevant months, Volkswagen imported several thousand more 1998 Passats and New Beetles than it had dealers and elected to send Miller Auto none of those vehicles.  Under such circumstances, the Commissioner's decision to enforce the Statute was not arbitrary or discriminatory.  Since Volkswagen is presumed to know the law, Magruder v. Commonwealth, 275 Va. 283, 304, 657 S.E.2d 113, 124 (2008), and certainly knew the number of Passats and New Beetles it had imported, its argument that the Commissioner's enforcement of the Statute

34

was arbitrary is without merit.  In addition, because Volkswagen's conduct was clearly proscribed by the Statute, it cannot complain of discriminatory enforcement in regard to the conduct of others.  See Hoffman, 455 U.S. at 495; Shivaee, 270 Va. at 125, 613 S.E.2d at 577.

The majority, however, cites Chapel v. Commonwealth, 197 Va. 406, 89 S.E.2d 337 (1955), and City of Waynesboro v. Keiser, 213 Va. 229, 191 S.E.2d 196 (1972), in support of its conclusion that the Statute gives the Commissioner too much discretionary enforcement authority.  In my view, those cases are not dispositive; neither actually involved a due process vagueness challenge and both cases pre-dated the Hoffman decision, which made clear that an individual "who engages in some conduct that is clearly proscribed cannot complain of the vagueness of the law as applied to the conduct of others." 455 U.S. at 495.

Despite that admonition, the majority, departing from an as-applied analysis, concludes:

> [T]he requirement of fair notice contained in due process is not satisfied if the public cannot determine what the law prohibits or the standard to which they must conform from either the language of the statute or a properly promulgated regulation or other official guidance provided prior to the statute being enforced, but rather only after the fact from the result of an arbitrary exercise of discretion by the administrative official charged with enforcing the statute.

35

While that conclusion may be a correct statement of law generally, whether the "public" can determine the standard is not the question we must answer in this appeal. Instead, the question is whether Volkswagen, on the facts before us, had fair notice of what conduct was prohibited. It did, and the Commissioner did not act arbitrarily in applying the Statute to that conduct.

Nonetheless, Volkswagen argues, and the majority agrees, that a manufacturer or distributor cannot comply with the requirements of Code § 46.2-1569(7) without guidance in the form of regulations.[5] Without such regulations, Volkswagen maintains, manufacturers and distributors are left with the Statute alone, which does not address the multiple factors that affect a decision regarding the allotment of new vehicles of each make, series, and model. But, it is precisely because there are many factors affecting an allotment decision that the General Assembly opted for "'flexibility and reasonable breadth, rather than meticulous specificity'" that would come with attempting to list every factor to consider. Grayned v. City of Rockford, 408 U.S. 104, 110 (1972) (quoting Esteban v. Central Missouri State Coll., 415 F.2d 1077, 1088 (8th Cir.

---

[5] Code § 46.2-203 authorizes the Commissioner to "adopt reasonable administrative regulations necessary to carry out the laws administered by the Department [of Motor Vehicles]."

36

1969)).  The Statute is "not fatally indefinite because questions may arise as to its applicability, or opinions may differ with respect to what falls within its terms, or because it is difficult to enforce."  Fallon Florist, Inc. v. City of Roanoke, 190 Va. 564, 590, 58 S.E.2d 316, 329 (1950).  Volkswagen simply cannot argue that Code § 46.2-1569(7) specifies " 'no standard of conduct . . . at all' " when viewed in light of the facts of this case.[6]  Hoffman, 455 U.S. at 495 n.7 (quoting Goguen, 415 U.S. at 578).

Finally, I believe the majority does not consider the Commissioner's narrowing construction of the Statute.  See Washington State Grange v. Washington State Republican Party, 552 U.S. 442, ___, 128 S.Ct. 1184, 1190 (2008) (noting importance of "accord[ing] a law a limiting construction to avoid constitutional questions").  The Commissioner stated in the August 1, 2005 hearing decision:

> By using basic mathematics to analyze whether
> an allocation of zero vehicles would satisfy
> the statutory requirement that a manufacturer
> ship to a dealer the number of new vehicles of
> each make, series, and model needed by the
> dealer to receive a percentage of total new
> vehicle sales of each make, series, and model
> equitably related to the total new vehicle
> production or importation currently being

---

[6] We should not assume that the Commissioner will not promulgate "administrative regulations that will sufficiently narrow potentially vague or arbitrary interpretations" of the statute.  Hoffman, 455 U.S. at 504.

achieved nationally by each make, series, and model covered under the franchise, I find that such an allocation would generally not satisfy the statutory requirement in months where, as in this case, the national importation numbers exceed the number of dealers nationally, and particularly where, as in this case, the vehicles are newly introduced makes, series or models.  An allocation of zero vehicles, assuming a dealer has no such vehicles in inventory, translates to zero sales and zero sales, expressed as a percentage of new vehicle sales, would be zero percent.  It is my opinion that shipping a number of vehicles that will enable a dealer to achieve or receive zero percent of the sales of a vehicle is generally not equitably related to national importation. I would note that I am limiting this finding, that a shipment of zero vehicles will not allow a dealer to achieve a percentage of vehicle sales equitably related to national importations, to newly introduced makes, series and models of vehicles, such as the Passats and Beetles in this case, where no meaningful history of dealer or national sales exist for the new vehicle.  I decline to comment on whether this analysis or finding would stand in situations where there is reliable data regarding the sales histories for particular vehicles nationally and by individual dealers.

In conclusion, it remains unclear to me how the majority can conduct an as-applied analysis by focusing on whether Volkswagen was "otherwise capable of" shipping at least one Passat and one New Beetle to Miller Auto during the relevant months without considering the "total new vehicle . . . importation" of 1998 Passats and New Beetles "achieved nationally" by Volkswagen in relation to the number of dealers and without asking, based on those numbers, whether the

38

Statute gave Volkswagen fair notice that failing to ship any such vehicles to Miller Auto was proscribed. Code § 46.2-1569(7). In essence, the majority rewrites the Statute it analyzes. It ignores the mathematical equitable relationship required by the terms of Code § 46.2-1569(7), and instead constructs its own legal test and then applies that test to a hypothetical situation.[7]

For these reasons, I conclude Code § 46.2-1569(7), as applied to the facts of this case, is not impermissibly vague under the Due Process Clause.

## II. COMMERCE CLAUSE CHALLENGE

Having concluded that the Statute is not impermissibly vague as applied, I now turn to Volkswagen's remaining assignment of error: that the Court of Appeals erred by failing to hold that Code § 46.2-1569(7) "violates the dormant Commerce Clause of the United States Constitution."

The power vested in the Congress of the United States to regulate interstate commerce, see U.S. Const. art. I, § 8, cl. 3, has long been understood to restrict, but not entirely

---

[7] While the majority does not rely on it for its conclusion, Volkswagen argues that Miller Auto's failure to obtain repair equipment for the 1998 Passats was a relevant factor in determining the Statute's validity. That factor, if relevant, does not alter my conclusion given the facts of this case.

remove, the States' power "to make laws governing matters of local concern which nevertheless in some measure affect interstate commerce or even, to some extent, regulate it." Southern Pac. Co. v. Arizona, 325 U.S. 761, 767 (1945) (citing Cooley v. Board of Wardens, 53 U.S. (12 How.) 299 (1852); Willson v. Black Bird Creek Marsh Co., 27 U.S. (2 Pet.) 245 (1829)); see also Healy v. Beer Inst., 491 U.S. 324, 335-36 (1989) (noting the "Constitution's special concern both with the maintenance of a national economic union unfettered by state-imposed limitations on interstate commerce and with the autonomy of the individual States within their respective spheres").  However, under "[t]he doctrine of the dormant Commerce Clause,"[8] the States are prohibited "from engaging in economic protectionism," Appalachian Voices v. State Corp. Comm'n, 277 Va. 509, 517, 675 S.E.2d 458, 461 (2009), i.e., " 'regulatory measures designed to benefit in-state economic

_____

    [8] The "dormant" or "negative" Commerce Clause is a "corollary rule" that has developed in the decisions of the United States Supreme Court.  Appalachian Voices v. State Corp. Comm'n, 277 Va. 509, 516, 675 S.E.2d 458, 461 (2009). "Although the Constitution does not in terms limit the power of States to regulate commerce, [the Supreme Court of the United States has] long interpreted the Commerce Clause as an implicit restraint on state authority, even in the absence of a conflicting federal statute."  United Haulers Ass'n v. Oneida-Herkimer Solid Waste Mgmt. Auth., 550 U.S. 330, 338 (2007); accord Department of Revenue of Kentucky v. Davis, 553 U.S. 328, ___, 128 S.Ct. 1801, 1808 (2008).

interests by burdening out-of-state competitors.' " Wyoming
v. Oklahoma, 502 U.S. 437, 454 (1992) (citation omitted).  The
dormant Commerce Clause thus prevents "state taxes and
regulatory measures impeding free private trade in the
national marketplace," Reeves, Inc. v. Stake, 447 U.S. 429,
437 (1980), and "protects markets and participants in
markets."  General Motors Corp. v. Tracy, 519 U.S. 278, 300
(1997).

The United States Supreme Court has constructed a "two-
tiered approach" for evaluating whether a state economic
regulation conforms to the Commerce Clause's negative command.
Healy, 491 U.S. at 337 n.14.  The first tier is known as the
"discrimination tier," and the second tier is generally
referred to as the "undue burden tier."  Yamaha Motor Corp. v.
Jim's Motorcycle, Inc., 401 F.3d 560, 567 (4th Cir. 2005).
Because "there is no clear line separating the category of
state regulation" subject to the discrimination test and the
category subject to the undue burden test, Brown-Forman
Distillers Corp. v. New York State Liquor Auth., 476 U.S. 573,
579 (1986), a state statute must satisfy the conditions of
both tiers of analysis to withstand scrutiny.  See C & A
Carbone v. Town of Clarkstown, 511 U.S. 383, 390 (1994);
Tracy, 519 U.S. at 300 n.12.  Under either tier, or test, the
burden to show a violation of the dormant Commerce Clause

41

rests on the party challenging the validity of a state statute.  See Hughes v. Oklahoma, 441 U.S. 322, 336 (1979); Baude v. Heath, 538 F.3d 608, 613 (7th Cir. 2008).

Under the discrimination test, a state statute is generally struck down "without further inquiry," when the "statute directly regulates or discriminates against interstate commerce,[] when its effect is to favor in-state economic interests over out-of-state interests," Brown-Forman, 476 U.S. at 579, or when "the practical effect of the regulation is to control conduct beyond the boundaries of the State," Healy, 491 U.S. at 336.  The discrimination test, therefore, applies a "virtually per se rule of invalidity." Philadelphia v. New Jersey, 437 U.S. 617, 624 (1978).

However, a state statute that clearly discriminates against interstate commerce will not be struck down if the discrimination is " 'demonstrably justified by a valid factor unrelated to economic protectionism.' "  Wyoming, 502 U.S. at 454.  In other words,

> once a state law is shown to discriminate against interstate commerce "either on its face or in practical effect," the burden falls on the State to demonstrate both that the statute "serves a legitimate local purpose," and that this purpose could not be served as well by available nondiscriminatory means.

Maine v. Taylor, 477 U.S. 131, 138 (1986) (quoting Hughes v. Oklahoma, 441 U.S. 322, 336 (1979)); accord Department of

42

Revenue of Kentucky v. Davis, 553 U.S. 328, ___, 128 S.Ct. 1801, 1808 (2008). And, the "practical effect" of the challenged statute must not be considered in isolation but in conjunction "with the legitimate regulatory regimes of other States and what effect would arise if not one, but many or every, State adopted similar legislation." Healy, 491 U.S. at 336. "[T]he Commerce Clause protects against inconsistent legislation arising from the projection of one state regulatory regime into the jurisdiction of another State." Id. at 336-37. The prohibition against discrimination applies even where only a minimal portion of interstate commerce is discriminated against: "The volume of commerce affected measures only the extent of the discrimination; it is of no relevance to the determination whether a State has discriminated against interstate commerce." Wyoming, 502 U.S. at 455.

If a statute is found not to discriminate either on its face or in its practical effect, it must then be examined under the second tier, the "undue burden" test of Pike v. Bruce Church, Inc., 397 U.S. 137 (1970):

> Where the statute regulates even-handedly to effectuate a legitimate local public interest, and its effects on interstate commerce are only incidental, it will be upheld unless the burden imposed on such commerce is clearly excessive in relation to the putative local benefits. If a legitimate local purpose is found, then the question

43

becomes one of degree[;] the extent of the burden that will be tolerated will of course depend on the nature of the local interest involved, and on whether it could be promoted as well with a lesser impact on interstate activities.

Id. at 142 (internal citation omitted). A court must defer to the state legislative body when evaluating whether a statute has " 'a legitimate local purpose' " and " 'putative local benefits,' " but must more closely examine the statute's burdens. Yamaha, 401 F.3d at 569 (quoting Pike, 397 U.S. at 142). "State laws frequently survive this Pike scrutiny." Davis, 553 U.S. at ___, 128 S.Ct. at 1808.

Volkswagen does not contend that the Statute either facially discriminates against interstate commerce or favors in-state economic interests over out-of-state interests. Instead, Volkswagen asserts that the Statute is per se invalid because it has the practical effect of controlling commercial conduct outside the Commonwealth, and if other States adopted similar legislation, "commercial gridlock" would result. Alternatively, Volkswagen contends the Statute unduly burdens interstate commerce under the Pike test.

Volkswagen argues that the Statute requires an automobile manufacturer or distributor to compare the number of vehicles shipped into Virginia with the number of vehicles imported nationally and that a distributor would violate the Statute if it decreased the number of vehicles shipped to Virginia

44

without making similar changes nationally.  In Volkswagen's words: "[I]f the distributor desires to decrease the number of vehicles that it ships to its Virginia dealers, then it must decrease the number of vehicles that it imports nationally and, correspondingly, the number of vehicles that it ships to dealers located both in Virginia and in other states." Volkswagen maintains that, because the number of vehicles it imports into the United States annually is a fixed resource, complying with the Statute has the "practical effect" of forcing Volkswagen to "alter its conduct in other states . . . to comply with the [Statute] by shipping vehicles to Virginia dealers that otherwise would have gone to dealers in other states."

Contrary to Volkswagen's argument, the Statute does not require that Virginia dealers collectively receive a percentage of new vehicles "equitably related to the total new vehicle[s]" imported nationally.  Instead, the Statute only requires that each individual dealer be allocated sufficient "new vehicles of each make, series and model needed by the dealer to receive a percentage of total new vehicle sales . . . equitably related to" the total new vehicles of such make, series and model imported nationally.  Therefore, Volkswagen's claim that there must necessarily be a

redistribution of vehicles across state lines to satisfy Code § 46.2-1569(7) does not follow.

As the majority explains, Miller Auto, like the approximately 600 Volkswagen franchise dealers in the United States during the relevant period, obtained its stock of 1998 Passat and New Beetle vehicles, which were manufactured abroad, on the basis of Volkswagen's national allocation system. That system used a mathematical algorithm designed to determine where particular vehicles were most needed and most likely to be sold to the public. Miller Auto was located in a sales area that included Volkswagen dealers in Northern Virginia, Maryland, and the District of Columbia.[9] Seventeen Volkswagen dealers operated throughout Virginia during the period in question. Volkswagen of America, Inc. v. Smit, 266 Va. 444, 447, 587 S.E.2d 526, 528 (2003). At that time, a dealer could not place an order for a particular vehicle but received new vehicles solely pursuant to the allocation system. An area executive had discretion to adjust the algorithm's results for each dealer located within his/her particular geographic sales area depending on several factors, including local market conditions, the reported inventories of

---

[9] During the relevant time, Miller Auto's sales area included six other Volkswagen dealers in Northern Virginia, four in Maryland, and one in the District of Columbia.

46

all dealers within the area, and the minimum stocking requirements of a dealer's franchise agreement.

While the foregoing evidence suggests that allocations conceivably could be made across state lines, the evidence does not demonstrate, however, that Virginia's "equitable relation" requirement did or will require Volkswagen to adjust either its nationwide allocation of new vehicles to the regional sales area that includes Virginia dealers, or its area-wide allocation of automobiles within that sales area to the detriment of dealers in Maryland and the District of Columbia.  The requirements of Code § 46.2-1569(7) do not direct the particulars of any manufacturer or distributor's vehicle allocation methodology.  As the Court of Appeals noted, "[n]othing in the [S]tatute . . . ties the number of vehicles allocated to dealers in Virginia to the number of vehicles allocated to dealers in other states[; n]or does the [S]tatute otherwise regulate the number of vehicles a distributor may allocate in any other state."  Volkswagen of America, Inc. v. Smit, 52 Va. App. 751, 791, 667 S.E.2d 817, 837 (2008).  Instead, the Statute only prohibits the failure to allocate sufficient vehicles "needed by the dealer to receive a percentage of total new vehicle sales . . . equitably related" to the total new vehicles imported nationally.  Code § 46.2-1569(7).  Volkswagen presented no

47

evidence to support its assertion that the Statute "mandat[es] that Volkswagen, and all other manufacturers design their systems of allocating vehicles among their dealers nationwide . . . to accommodate Virginia law."

Moreover, Volkswagen did not prove that it and/or other distributors could not reallocate vehicles among Virginia dealers to comply with the Statute instead of reallocating across state lines, in this case, among Volkswagen dealers in Virginia, whether located in Miller Auto's sales area or another sales area in Virginia.  Based on the record before the Court in this appeal, these two alternatives, intrastate or interstate reallocation, are equally probable, meaning Volkswagen failed to carry its burden to demonstrate that the Statute discriminates against interstate commerce.  See Cherry Hill Vineyard, LLC v. Baldacci, 505 F.3d 28, 37 (1st Cir. 2007) ("[T]he mere fact that a statutory regime [may have] discriminatory potential is not enough to trigger strict scrutiny under the dormant commerce clause."); Kleinsmith v. Shurtleff, 571 F.3d 1033, 1040 (10th Cir. 2009) ("[T]he party claiming discrimination has the burden to put on evidence of a discriminatory effect on commerce that is 'significantly probative, not merely colorable.' ") (quoting Alliance of Auto. Mfrs. v. Gwadosky, 430 F.3d 30, 40 (1st Cir. 2005)).

Without sufficient evidence to establish that the Statute necessarily requires interstate reallocation of vehicles to Virginia dealers, I am compelled to conclude that Code § 46.2-1569(7) does not have "the practical effect of . . . control[ling commercial] conduct beyond the boundaries of the State." Healy, 491 U.S. at 336. Furthermore, any regulation of intrastate allocation of vehicles that benefits and burdens solely intrastate dealers does not violate the dormant Commerce Clause.[10] See Grant's Dairy-Maine, LLC v. Commissioner of Maine Dep't of Agric., Food & Rural Res., 232 F.3d 8, 22 (1st Cir. 2000) ("The dormant Commerce Clause does not protect intrastate competition, but . . . safeguards interstate markets from discriminatory regulation."). Likewise, without evidence that the Statute has the practical effect of controlling interstate commerce, I cannot guess as to "what effect would arise if not one, but many or every, State adopted similar legislation." Healy, 491 U.S. at 336.

Therefore, because Volkswagen had the burden to demonstrate that the Statute has the practical effect of controlling commercial conduct beyond the boundaries of

---

[10] My conclusion should not be read as suggesting that proof of interstate reallocation of vehicles would result necessarily in a finding that the Statute violates the dormant Commerce Clause, but merely that a determination of

49

Virginia and has not carried that burden, I reject Volkswagen's claim that the Statute violates the dormant Commerce Clause under the discrimination test.  Cf. American Trucking Ass'ns v. Michigan Pub. Serv. Comm'n, 545 U.S. 429, 434-37 (2005) (refusing to invalidate a tax challenged under the dormant Commerce Clause in part because the challenger failed to provide "convincing evidence showing that the tax deters, or for that matter discriminates against, interstate activities"); Kleinsmith, 571 F.3d at 1040-43 (rejecting a claim that a state statute has the practical effect of discriminating against interstate commerce because the party claiming discrimination failed to carry his burden of "put[ting] on evidence of a discriminatory effect . . . that is 'significantly probative, not merely colorable' " and "how the [statute had] alter[ed] the competitive balance between [in-state and out-of-state competitors]") (citation omitted); Cherry Hill Vineyard, 505 F.3d at 36 ("[A] plaintiff bringing a dormant commerce clause challenge based exclusively on the allegedly discriminatory effect of a statutory scheme is required to submit some probative evidence of adverse impact."); Yamaha, 401 F.3d at 563, 568-69 (holding that a Virginia statute allowing "any existing franchised dealer [of

discriminatory practical effect cannot be made on the record

motorcycles] to protest the establishment of a new dealership for the same brand anywhere in the Commonwealth" did not have the effect of "discriminat[ing] against interstate commerce" because the challenging franchisor "did not produce any evidence" that the statute's "probable effect" would be the reallocation of motorcycles to Virginia dealers "to the detriment of out-of-state dealers").

I now turn to the "undue burden" tier of analysis. However, the noted failure of Volkswagen to demonstrate that the Statute actually burdens interstate commerce, as opposed to intrastate commerce, prevents me from concluding that the "burden imposed on such commerce is clearly excessive in relation to the putative local benefits." Pike, 397 U.S. at 142.

> It is impossible to tell whether a burden on interstate commerce is "clearly excessive in relation to the putative local benefits" without understanding the magnitude of both burdens and benefits. Exact figures are not essential (no more than estimates may be possible) and the evidence need not be in the record if it is subject to judicial notice, but it takes more than lawyers' talk to condemn a statute under Pike. . . . [W]hoever wants to upset the law bears the[] burden[].

Baude, 538 F.3d at 612-13 (internal citations omitted).

---

in this appeal.

My refusal to find an undue burden on interstate commerce is buttressed by the significance of the unchallenged, putative local benefits: the "promot[ion of] the interest of the retail buyers of motor vehicles and [the] prevent[ion of] unfair methods of competition and unfair or deceptive acts or practices." Code § 46.2-1501. Thus, I cannot conclude that the Statute unduly burdens interstate commerce. See Kleinsmith, 571 F.3d at 1043-44 (having concluded "in the prior section of this opinion" that the challenger "has failed to carry his burden of proving that the . . . statute is discriminatory in practical effect," "we must reject" the dormant Commerce Clause challenge, as the challenger "has not produced evidence of any burden that the challenged law imposes on interstate commerce").

## III. CONCLUSION

For these reasons, I would hold that Code § 46.2-1569(7) is not impermissibly vague as applied in the circumstances of this case, and, I would reject Volkswagen's challenge under the dormant Commerce Clause. Thus, I respectfully dissent and would affirm the judgment of the Court of Appeals.