PRESENT:  All the Justices

DULLES DUTY FREE, LLC
                                                        OPINION BY
   v.  Record No. 160939                    JUSTICE STEPHEN R. McCULLOUGH
                                                        August 24, 2017
COUNTY OF LOUDOUN


FROM THE CIRCUIT COURT OF LOUDOUN COUNTY
Burke F. McCahill, Judge

Dulles Duty Free, LLC, challenges Loudoun County's imposition of a Business,

Professional, and Occupational License ("BPOL") tax on a substantial portion of its sales.  It

argues that the Import-Export Clause of the Constitution of the United States, U.S. Const. art. I, §

10, cl. 2, bars the County from imposing the tax.  The circuit court ruled in favor of the County.

For the reasons noted below, we reverse the judgment of the circuit court and remand this action

for a computation of the refunds for the relevant tax years that are due to the taxpayer.

BACKGROUND

Duty Free is a retailer of duty free merchandise at Dulles Airport in Loudoun County,

where it operates several stores.[1]  Every aspect of the duty free business is highly regulated.  As

required by federal law, Duty Free holds the alcohol, tobacco, fragrances, luxury goods, bags,

watches, and other products it sells in bonded warehouses in Florida and Texas.  Bonded carriers

transport the goods to a secure warehouse at Dulles Airport which, in turn, distributes the

merchandise to retail stores inside the airport.

The merchandise is sold in a restricted area of the airport.  Only passengers with boarding

passes may enter and these passengers must first go through security.  Duty Free can sell items to

both domestic and international passengers.  For domestic travelers, Duty Free charges a

---

[1] 19 U.S.C. § 1555 authorizes bonded duty free sales of merchandise for export.

Virginia sales tax and the purchaser takes immediate possession of the item. When the sale involves a bonded imported item, the domestic passenger pays an import duty. Duty Free does not challenge the imposition of the BPOL tax to such domestic sales.

International travelers, on the other hand, must present a passport and boarding pass to the cashier in the Duty Free shop. The cashier will swipe the boarding pass on the register to record the information that is on the boarding pass. Duty Free does not charge a Virginia sales tax for international export sales and does not collect any import duty, i.e. the sales are "duty free." Instead of receiving the item immediately, the traveler is given a receipt or ticket. A duty free runner delivers the item to the buyer at the jetway immediately prior to boarding and the customer hands the ticket to the runner. *See* 19 U.S.C. § 1555(b)(3)(F)(i)(II). If a passenger does not appear to collect the item, Duty Free voids the sale and returns the merchandise to the store.

Duty Free is able to track which sales are domestic and which sales are international. International sales represent over ninety percent of Duty Free's sales. Duty Free established that the following gross receipts were attributable to international travelers: for tax year 2009, $18,827,494; for tax year 2010, $13,747,954; for tax year 2011, $15,162,747; for tax year 2012, $18,203,469; and for tax year 2013, $20,151,691.

Duty Free does not dispute that it owns inventory and other personal property in Loudoun County. There is also no question that it employs a large number of personnel in the County to run its retail operations. Duty Free uses County roads, and benefits from the protection of County fire and rescue, law enforcement, the court system, and other County services.

Loudoun County requires every person "engag[ed] in a business" in Loudoun County to obtain a business license. Loudoun County Ordinance § 840.03(a). Accordingly, Duty Free has obtained a business license to operate in Loudoun County. Code § 58.1-3702 permits "the governing body of every county, city and town" to impose a "tax on the gross receipts or the Virginia taxable income of the business." Code § 58.1-3703.1(A)(3)(a) provides that "[w]henever the tax imposed by this ordinance is measured by gross receipts, the gross receipts included in the taxable measure shall be only those gross receipts attributed to the exercise of a privilege subject to licensure." The tax does not target imports or exports; it applies across the board to all sales.

Loudoun County has chosen to collect the tax based on the measure of gross receipts. *See* Loudoun County Ordinance § 840.14(o). Loudoun County defines "gross receipts" as "the whole, entire, total receipts attributable to the licensed privilege, without deduction." *Id.*; Loudoun County Ordinance § 840.01(k). The tax is calculated based on the prior year's gross receipts. *Id.*; *see also* Loudoun County Ordinance §§ 840.01(m); 840.03(d); 840.04(a); 840.14(o). For businesses with sales not more than $200,000 per year, the County levies a flat $30 fee. Loudoun County Ordinance § 840.13(c). For businesses with sales above the $200,000 threshold, the County collects 17 cents for every $100 in retail sales for all sales, not just those above $200,000. Loudoun County Ordinance § 840.14(o).

In 2014, Duty Free filed an application for correction of its BPOL taxes for the years 2009, 2010, 2011, 2012, and 2013. Duty Free does not challenge the imposition of the BPOL tax on its domestic sales. It argues, however, that applying the BPOL tax on the gross receipts of its international sales violates the Import-Export Clause of the Constitution of the United States.

3

Following a hearing, the circuit court issued a detailed memorandum opinion. The court canvassed the cases from the United States Supreme Court and concluded that "[t]he BPOL tax of Loudoun County does not violate the Import Export Clause of the U.S. Constitution." Consequently, the court held that Duty Free "is not entitled to relief from the assessments complained of in its Application." Duty Free appeals from this ruling.

ANALYSIS

"Arguments challenging the constitutionality of a statute or regulation are questions of law that this Court reviews de novo on appeal." *DiGiacinto v. Rector & Visitors of George Mason Univ.*, 281 Va. 127, 133, 704 S.E.2d 365, 368 (2011).

This case presents an "as applied" challenge rather than a challenge to the facial constitutionality of the BPOL tax. *Volkswagen of Am., Inc. v. Smit*, 279 Va. 327, 336, 689 S.E.2d 679, 684 (2010) ("Because our jurisprudence favors upholding the constitutionality of properly enacted laws, we have recognized that it is possible for a statute or ordinance to be facially valid, and yet unconstitutional as applied in a particular case."). We accord every legislative act a presumption of constitutionality, including laws subject to an as applied challenge. *Id.* A party which alleges a statute is being unconstitutionally applied bears the burden of proving that the statute is unconstitutional under a particular set of facts. *See FFW Enters. v. Fairfax County*, 280 Va. 583, 590, 701 S.E.2d 795, 800 (2010).

The Import-Export Clause provides, in relevant part, that "[n]o State shall, without the Consent of the Congress, lay any Imposts or Duties on Imports or Exports, except what may be absolutely necessary for executing its inspection Laws." U.S. Const. art. I, § 10, cl. 2.

4

The problems that led to the inclusion of this Clause in the Constitution are well known. "One of the major defects of the Articles of Confederation, and a compelling reason for the calling of the Constitutional Convention of 1787, was the fact that the Articles essentially left the individual States free to burden commerce both among themselves and with foreign countries very much as they pleased." *Michelin Tire Corp. v. Wages*, 423 U.S. 276, 283 (1976). In an introduction to the Debates of the Constitutional Convention, James Madison noted that New Jersey was likened to a "cask tapped at both ends" by New York and Philadelphia; and North Carolina as the "patient bleeding at both arms" – with Virginia and South Carolina happily serving as phlebotomists. 2 The Papers of James Madison 691-92 (Henry D. Gilpin, ed., Washington, D.C.: Langtree & O'Sullivan, 1840). These taxes on imported and exported goods "nourish[ed] unceasing animosities" and, if left unchecked, Madison thought, would likely end "in serious interruptions of the public tranquility." The Federalist No. 42, at 264 (J. Madison) (Clinton Rossiter ed., 2003). The Import-Export Clause, along with the Commerce Clause and the Export Clause, was designed to suppress fratricidal trade policies and thus "provide for the harmony and proper intercourse among the States." *Id.* at 263.

I.    OVERVIEW OF THE UNITED STATES SUPREME COURT'S IMPORT-EXPORT CLAUSE JURISPRUDENCE.

Resolution of the constitutional propriety of the BPOL tax to Duty Free's in-transit export sales hinges on the applicability, and ongoing validity, of the decision in *Richfield Oil Corp. v. State Bd. of Equalization*, 329 U.S. 69 (1946). Duty Free argues that *Richfield Oil* controls. The County asserts that the case is distinguishable or superseded by later decisions.

5

A.      The decision in *Richfield Oil*.

Richfield Oil entered into a contract with the government of New Zealand for the sale of oil. *Id*. at 71. None of the oil was to be used or consumed in the United States; all of it was for export.[2] *Id.* California assessed a retail sales tax against Richfield Oil that was "measured by the gross receipts from the transaction." *Id.* at 71-72. Richfield Oil argued that the tax violated the Import-Export Clause and the Supreme Court agreed.

The Court examined whether the oil was an "export." *Id.* at 78. Surveying its precedent, the Court noted that goods intended for export were not exempt from the "ordinary burdens of taxation." *Id.* at 78-80. But once goods have been placed with a common carrier for export, "or have been started upon such transportation in a continuous route or journey" (i.e. the goods are in transit), they are exports for purposes of the Import-Export Clause and may not be taxed. *Id.* at 79. The Court concluded that the oil was an export because it had been delivered "into the hold of the vessel," and this delivery "marked the commencement of the movement of the oil abroad." *Id.* at 82-83.

The Court found unpersuasive California's argument that the tax in question was "not an impost within the meaning of the Import-Export Clause." *Id.* at 83. The Court accepted the California Supreme Court's characterization of the tax as "an excise tax for the privilege of

---

[2] Richfield Oil carried the oil by pipeline from its refinery in California to storage tanks at the Los Angeles harbor, where a New Zealand naval vessel appeared to receive it. The price was free on board ("F.O.B.") Los Angeles, with payment made in London, England, and delivery was "to the order of the Naval Secretary" of New Zealand. When the vessel had docked, Richfield Oil pumped the oil from the storage tanks into the vessel. Customary shipping documents were given to the master, including a bill of lading which designated Richfield Oil as the shipper and consigned the oil to a designated Naval-Officer-In Charge in Auckland, New Zealand. 329 U.S. at 71.

6

conducting a retail business measured by the gross receipts from sales; that it is not laid upon the consumer and does not become a tax on the sale or because of the sale." *Id.* at 83-84. California pointed out that the tax did not directly target exports, that it instead was "measured by the gross receipts of retail sales" and was "levied on retailers 'For the privilege of selling tangible personal property at retail.'" *Id.* at 83. "[W]hether the tax deprives the taxpayer of a federal right," the Court reasoned, turns not on the characterization of the tax under state law but, rather, on "its operation and effect." *Id*. at 84. The Court explained that the Import-Export Clause prohibits more than "taxes laid specifically upon the exported goods themselves." *Id.* at 85. Were it otherwise, the Court observed, states would easily impose taxes "nominally conforming to the constitutional restriction but in effect overriding it." *Id.* The Court noted, quoting Chief Justice John Marshall, that a tax measured by the gross receipts of sales is effectively a tax on the article itself. *Id.* at 84 ("[A] tax on the sale of an article . . . is a tax on the article itself.") (quoting *Brown v. Maryland*, 25 U.S. (12 Wheat) 419, 444 (1827)). A tax that effectively "add[s] to the price of the article, and [is] paid by the consumer, or by the importer himself," such as a tax "on the occupation of an importer" is in practical effect no different from "a direct duty on the article itself." *Id.* at 85. The Court concluded that California's tax was "an impost upon an export within the meaning of Article I, Section 10, Clause 2, and is therefore unconstitutional." *Id*. at 86.

        B.       Developments since *Richfield Oil*.

        In *Low v. Austin*, 80 U.S. 29 (1872), the Supreme Court interpreted the Import-Export Clause to prohibit a State "from imposing a nondiscriminatory ad valorem property tax on imported goods until they lose their character as imports and become incorporated into the mass

7

of property in the State." *Michelin*, 423 U.S. at 282 (describing the test in *Low v. Austin*). This test was known as the "original package doctrine." Boris I. Bittker & Brannon P. Denning, *The Import-Export Clause*, 68 Miss. L.J. 521, 531 (1998). Following extensive scholarly criticism of *Low v. Austin*, the Court revisited its approach in 1976 in *Michelin*, where the tax at issue was an ad valorem inventory tax Georgia imposed on automobile and truck tires and tubes that were imported from France and Nova Scotia. 423 U.S. at 279. The tax was "nondiscriminatory" – it did not single out imports for taxation. *Id.* at 281.

The Court surveyed the history that led to the adoption of the Import-Export Clause and identified "three main concerns" the Clause sought to alleviate:

> [1] the Federal Government must speak with one voice when regulating commercial relations with foreign governments, and tariffs, which might affect foreign relations, could not be implemented by the States consistently with that exclusive power;
>
> [2] import revenues were to be the major source of revenue of the Federal Government and should not be diverted to the States; and
>
> [3] harmony among the States might be disturbed unless seaboard States, with their crucial ports of entry, were prohibited from levying taxes on citizens of other States by taxing goods merely flowing through their ports to the other States not situated as favorably geographically.

*Id.* at 285-86.

The Court observed that "[n]othing in the history of the Import-Export Clause even remotely suggests that a nondiscriminatory ad valorem property tax which is also imposed on imported goods *that are no longer in import transit* was the type of exaction that was regarded as objectionable by the Framers of the Constitution." *Id.* at 286 (emphasis added). The Court

8

overruled *Low v. Austin* and fashioned a new three-part test based on the three goals that led to the adoption of the Import-Export Clause. *Id.* at 301, 286-89.

Applying the three-part test, the Court held that the Georgia ad valorem tax at issue did not violate the Import-Export Clause. *Id.* at 286-89. The Court found that the tax had no impact on the Federal Government's exclusive regulation of foreign commerce because, "[b]y definition, such a tax does not fall on imports as such because of their place of origin." *Id.* at 286. In addition, a non-discriminatory ad valorem tax does not "deprive the Federal Government of the exclusive right to all revenues from imposts and duties on imports and exports." *Id.* Finally, such a tax does "not interfere with the free flow of imported goods among the States." *Id.* at 288. On this point, the Court explained that "the Clause was fashioned to prevent the imposition of exactions which were no more than transit fees on the privilege of moving through a State." *Id.* at 290. The Court suggested that "to the extent there is any conflict whatsoever with this purpose of the Clause, it may be secured merely by prohibiting the assessment of even nondiscriminatory property taxes on goods which are merely in transit through the State when the tax is assessed." *Id.*

In holding that Georgia's ad valorem tax was not an "impost" or "duty" under the Import-Export Clause, the Court stressed its "nondiscriminatory" nature. *Id.* at 279, 281, 282, 283, 286, 287, 288. The Court observed that

> [u]nlike imposts and duties, which are essentially taxes on the commercial privilege of bringing goods into a country, [nondiscriminatory ad valorem taxes] are taxes by which a State apportions the cost of such services as police and fire protection among the beneficiaries according to their respective wealth; there is no reason why an importer should not bear his share of these costs along with his competitors handling only domestic goods.

9

*Id.* at 287.

The Court summarized the new approach in *Department of Revenue of Wash. v. Association of Wash. Stevedoring Cos.*, 435 U.S. 734 (1978). It explained that "[p]revious cases had assumed that all taxes on imports and exports and on the importing and exporting processes were banned by the Clause." *Id*. at 752. "Before *Michelin*, the primary consideration was whether the tax under review reached imports or exports." *Id.* For imports, "the analysis applied the original-package doctrine." *Id.* "So long as the goods retained their status as imports by remaining in their import packages, they enjoyed immunity from state taxation." *Id.* "With respect to exports, the dispositive question was whether the goods had entered the 'export stream,' the final, continuous journey out of the country." *Id.* "As soon as the journey began, tax immunity attached." *Id.* "*Michelin* initiated a different approach to Import-Export Clause cases." *Id.* at 752. Rather than focus on whether the goods were imports, the Court "analyzed the nature of the tax to determine whether it was an 'Impost or Duty,'" and it did so by applying the three-part test mentioned above. *Id.*

*Michelin* dealt with *imports*. *Washington Stevedoring Cos.*, decided two years after *Michelin*, examined whether *Michelin*'s three-part test for assessing the constitutionality of non-discriminatory taxes on imports should also apply to *exports*. Washington State imposed a business and occupation tax upon stevedoring, "the business of loading and unloading cargo from ships." *Id.* at 737. After its overview of the change wrought by the *Michelin* decision, the Court adopted what it described as a "similar" approach to exports. *Id.* at 754. With respect to the second policy identified in *Michelin*, protecting the Federal Government's revenue from taxes on imports, the Court noted that, in contrast to imports, the Constitution forbids the Federal

10

Government from taxing exports. *Id.* at 758. *See* U.S. Const., Art. I § 9, cl. 5. Despite this difference, a "tax relating to exports can be tested for its conformance with the first and third policies" identified in *Michelin*. *Id.*

Applying this test, the Court concluded, first, that the tax did not "restrain the ability of the Federal Government to conduct foreign policy." *Id.* at 754. The tax applies "to virtually all businesses in the State," and it is not a "special protective tariff. . . . No foreign business or vessel is taxed." *Id.* As in *Michelin*, "[t]he tax merely compensates the State for services and protection" it provides to businesses. *Id.* Second, the tax "falls upon a taxpayer with [a] reasonable nexus to the State, is properly apportioned, does not discriminate, and relates reasonably to services provided by the State." *Id.* at 754-55.

The Court added a caveat: "Because the goods [in *Michelin*] were no longer in transit, however, the Court did not have to face the question whether a tax relating to goods in transit would be an 'Impost or Duty' even if it offended none of the policies behind the Clause." *Id.* at 755. In *Washington Stevedoring,* "the tax [did] not fall on the goods themselves." *Id.* Instead, the tax fell on the activity of moving the goods. *Id.* Thus, although the tax related to goods in transit, the fact that it did not fall upon the goods themselves "leads to the conclusion that the Washington tax is not a prohibited 'Impost or Duty' when it violates none of the policies" animating the Clause. *Id.* The Court expressly declined to reach the question of whether the *Michelin* approach should be employed "when a State directly taxes imports or exports in transit." *Id.* at 757 n.23.

The Court also repudiated what it characterized as dicta in *Richfield Oil*, the proposition "that the Import-Export Clause effects an absolute prohibition on all taxation of imports and

11

exports." *Id*. at 759. The Court reaffirmed "the central holding of *Michelin* that the absolute ban is only of 'Imposts or Duties' and not of all taxes." *Id.*

The Court concluded as follows:

> The Washington business and occupation tax, as applied to stevedoring, reaches services provided wholly within the State of Washington to imports, exports, and other goods. The application violates none of the constitutional policies identified in *Michelin*. It is, therefore, not among the "Imposts or Duties" within the prohibition of the Import-Export Clause.

*Id.* at 761.

Later, in *United States v. International Bus. Mach. Corp.*, 517 U.S. 843, 862 (1996), the Court indicated in dicta that it has not overruled the core holding in *Richfield Oil* with respect to a state tax that is assessed directly on goods in import or export transit. Although that case addressed the Export Clause rather than the Import-Export Clause, the Court stated that it had "never upheld a state tax assessed directly on goods in import or export transit." *Id*. The Court further indicated that compliance with the Import-Export Clause may be secured "'by prohibiting the assessment of even nondiscriminatory property taxes on [import or export] goods which are merely in transit through the State when the tax is assessed.'" *Id.* (alteration in original) (quoting *Michelin*, 423 U.S. at 290).

Finally, in *Itel Containers Int'l Corp. v. Huddleston*, 507 U.S. 60, 78 (1993), the Court upheld a sales tax on leases of containers used in international shipping. The Court rejected the argument that *Richfield Oil* was controlling, noting with regard to the prohibition on direct taxation of imports and exports "in transit" that "[e]ven assuming that rule has not been altered by the approach we adopted in *Michelin*, it is inapplicable here." *Id*. at 77. As in *Washington*

12

*Stevedoring*, the tax at issue in *Itel* fell "upon a service distinct from [import] goods and their value." *Id.* at 78 (alteration in original) (quoting *Washington Stevedoring*, 435 U.S. at 757).

        C.        The bright line *Richfield Oil* test, rather than the policy based *Michelin* test, supplies the rule of decision on the present facts.

It is fair to say that courts have struggled to determine which test to apply when it comes to assessing the constitutionality of taxes that fall on export goods in transit. In *Louisiana Land & Exploration Co. v. Pilot Petroleum Corp.*, 900 F.2d 816 (5th Cir. 1990), the United States Court of Appeals for the Fifth Circuit invalidated a state tax on jet fuel sold for export to a foreign country. *Id.* at 821. While noting that *Richfield Oil* has "never been overruled by the United States Supreme Court," *id.* at 819, that court relied on both *Richfield Oil* and *Michelin* to conclude that the Alabama tax at issue violated the Import-Export Clause. *Id.* at 820-21.

In *Virginia Indonesia Co. v. Harris Cnty. Appraisal Dist.*, 910 S.W.2d 905 (Tex. 1995), the majority of a divided Texas Supreme Court observed that "[t]he United States Supreme Court has yet to announce whether the new approach set forth in *Michelin* should be applied to a direct tax on imports or exports in transit." *Id.* at 910. The Court noted that "[a]lthough the *Michelin* court rejected the original package doctrine, it did not overrule . . . any of the stream of export cases, and the two doctrines are different enough that the rejection of one does not, of itself, signify the demise of the other." *Id.* at 910-11. The Court concluded that a county's ad valorem tax on goods in "the export stream" violated the Import-Export Clause. *Id.* at 915. Two justices dissented, arguing that the *Michelin* test was the right one to apply and that the tax was valid under that test. *Id.* at 915-16, 925.

Similarly, in *U.S. Steel Mining Co. v. Helton*, 631 S.E.2d 559 (W. Va. 2005), a divided Supreme Court of Appeals of West Virginia accepted *Richfield Oil* as binding, but held that the

13

goods were not placed in export at the time a coal severance tax applied (when the coal was extracted from the natural resources of the state) and, therefore, there was no violation of the Import-Export Clause. *Id.* at 567. *See also Ammex, Inc. v. Dep't of Treasury*, 603 N.W.2d 308, 313 (Mich. Ct. App. 1999) (concluding that *Richfield Oil* retains "precedential value," but that the tax in question did not fall upon oil that was an "export" within the intendment of the Import-Export Clause, since it was sold at retail on the United States side of a bridge connecting to Canada, and would have been at least partly used in the United States, even by customers who drove directly over the bridge.[3]

In contrast, a United States District Court in Guam applied the *Michelin* test to a direct tax on goods in export. *See Duty Free Shoppers, Ltd. v. Tax Commissioner*, 464 F. Supp. 730, 735-36 (D. Guam 1979) (finding that duty free goods as sold only to passengers leaving the Territory for foreign countries have clearly embarked on their final, continuous journey out of the country, since their movement to foreign shores has "started (or) been committed," and commenting that "[a]pplying either phraseology, we are satisfied that when liquor and tobacco

---

[3] The court in *Ammex, Inc.* summarized the exportation concept, 603 N.W.2d at 463-64, as follows:

> The word "export" means the transportation of goods from the United States to a foreign country. *Swan & Finch Co. v. United States*, 190 U.S. 143, 145 (1903). "Exportation is a severance of goods from the mass of things belonging to this country with an intention of uniting them to the mass of things belonging to some foreign country." *Id.* Thus, an article does not constitute an "export" if there exists a practical possibility of diversion to domestic markets. *See Joy Oil Co. v. State Tax Comm'n of Michigan*, 337 U.S. 286, 288 (1949) (citing *Richfield Oil*, [329 U.S.] at 82). Similarly, an article cannot be considered an "export" within the meaning of the Import-Export Clause if "it will be used in this country for its designed purpose, before being shipped abroad." *See Itel Containers*, 507 U.S. at 82 (Scalia, J., concurring).

14

products are delivered to a departing passenger en route to foreign shores in the 'sterile area' of the airport, such goods, having entered the export stream, constitute exports;" concluding, however, that no policy of the Import-Export Clause is thereby violated).

Our review of this mass of precedent yields two conclusions that guide our resolution of this case. First, the Supreme Court has not overruled *Richfield Oil* and, while it has significantly revised its Import-Export Clause jurisprudence, the Court has carefully carved out for future disposition the issue whether the *Michelin* test would apply to a non-discriminatory tax that falls on export goods in transit. *See Itel Containers*, 507 U.S. at 77; *Washington Stevedoring*, 435 U.S. at 757 n.23; *Michelin*, 423 U.S. at 290. We cannot ignore the Court's repeated signals to that effect. Consequently, we conclude that *Richfield Oil* supplies the rule of decision. As the Supreme Court has noted

> If a precedent of this Court has direct application in a case, yet appears to rest on reasons rejected in some other line of decisions, the [lower courts] should follow the case which directly controls, leaving to this Court the prerogative of overruling its own decisions.

*Rodriguez de Quijas v. Shearson/American Express, Inc.*, 490 U.S. 477, 484 (1989).

Second, the Court has not retreated from its method of assessing the constitutionality of a state tax based on its operation and effect. *Richfield Oil*, 329 U.S. at 84. A State's characterization of the tax does not control. *Id.*

II.    THE BPOL TAX IS INDISTINGUISHABLE FROM THE PROHIBITED GROSS RECEIPTS TAX IN *RICHFIELD OIL*.

The County attempts to distinguish the BPOL tax from the tax the Court invalidated in *Richfield Oil*. We find the County's arguments unpersuasive. As a threshold matter, we need not confront the often vexatious problem of whether the goods are in export transit. There is no

15

dispute that the merchandise Duty Free sells to international travelers constitutes export goods in transit: these travelers, who are leaving the country, have passed through security checks and they must present their passports and an airline boarding pass to complete the purchase.

The County argues that the BPOL tax is not a "direct tax" and does not resemble the tax the Court invalidated in *Richfield Oil*. The County takes the view that the tax is placed on "the privilege to engage in a business activity, and that is not the same as a tax on goods." We disagree. The characterization of the tax for purposes of state law does not control whether the tax violates the Import-Export Clause. *Richfield Oil*, 329 U.S. at 84 (state's characterization of a tax "is not determinative of the question whether the tax deprives the taxpayer of a federal right."). Under *Richfield Oil*, a tax that falls directly on export goods in transit violates the Clause. *Id.* (constitutionality of a tax on export goods in transit hinges on "its operation and effect."). The BPOL tax is imposed on a percentage of gross sales, just like California's tax in *Richfield Oil*. For every $100 worth of sales, Duty Free must pay 17 cents in tax. Although the tax is imposed on the gross receipts of a business, it is in its "operation and effect" a direct tax on the export goods in transit. *Richfield Oil*, 329 U.S. at 84; *see also Crew Levick Co. v. Pennsylvania*, 245 U.S. 292, 295-96 (1917) ("[I]mposition of a percentage upon each dollar of the gross transactions in foreign commerce … [is] in effect an impost or duty upon exports.").

The BPOL tax is imposed on "the gross receipts . . . of the business." Code § 58.1-3702. The California tax invalidated in *Richfield Oil* was based on "the gross receipts of retail sales and is levied on retailers '[f]or the privilege of selling tangible personal property at retail.'" *Richfield Oil*, 329 U.S. at 83. We are hard pressed to see a difference of constitutional magnitude between

16

the BPOL tax and the tax at issue in *Richfield Oil*. Indeed, the parallels between the BPOL tax and the tax under review in *Richfield Oil* are striking.

We also perceive no constitutional significance in the fact that retailers in California were authorized to collect the tax from the consumers, as opposed to the BPOL tax, for which liability lies with the business. The California tax at issue in *Richfield Oil* was ultimately the responsibility of retailers. *See Richfield Oil*, 329 U.S. at 84 ("[The tax] is not laid upon the consumer."); *see also Western Lithograph Co. v. State Bd. of Equalization*, 78 P.2d 731, 734-35 (Cal. 1938) ("The provisions of the [retail sales tax] act itself specifically are that the tax is laid upon and is a direct obligation of the retailer" and the tax should not be "considered as a tax on the consumer.").

It may be that the Supreme Court will provide additional guidance concerning the applicability of the Import-Export Clause to nondiscriminatory taxes like the BPOL tax that would be imposed upon on export goods in transit. Until then, *Richfield Oil* compels the conclusion that the BPOL tax is unconstitutionally applied to Duty Free's international export sales.

## CONCLUSION

The BPOL tax as applied to Duty Free's export goods in transit constitutes an impermissible impost upon an export in violation of the Import-Export Clause of the Constitution of the United States. Consequently, we will reverse the judgment of the circuit court and remand this matter for a determination of the refund due to Duty Free.

*Reversed and remanded.*

17