PRESENT: All the Justices

THE CORPORATE EXECUTIVE BOARD COMPANY

OPINION BY

v. Record No. 171627          JUSTICE STEPHEN R. McCULLOUGH

February 7, 2019

VIRGINIA DEPARTMENT OF TAXATION

FROM THE CIRCUIT COURT OF ARLINGTON COUNTY
Daniel S. Fiore, II, Judge

The Corporate Executive Board Company ("CEB") challenges its income tax assessment

for the years 2011, 2012, and 2013. CEB contends that the method employed by the Virginia

Department of Taxation is unconstitutional as applied to CEB under the "dormant" Commerce

Clause and the Due Process Clause of the United States Constitution. Alternatively, CEB argues

that it is entitled to an adjustment because the statutory method for computing its tax constitutes

an "inequitable" method under the Tax Department's regulations. For the reasons noted below,

we will affirm the judgment of the circuit court.

## BACKGROUND

I.      CEB SELLS MOST OF ITS SERVICES TO CUSTOMERS OUTSIDE OF VIRGINIA.

CEB is a corporation that is headquartered in Arlington, Virginia. CEB describes itself as

"the premier 'best practices' advisory firm in the world." Most of CEB's revenue comes from an

annual fixed fee subscription service of its "Core Product." This subscription service provides

"online access to best practices research, executive education and networking events, and tools

used by executives to analyze business functions and processes." In addition, CEB sells

professional services, or "Solutions," that include employee education and performance

analytics. It also conducts executive education seminars. CEB's customers include 97% of the

Fortune 100 companies and more than 10,000 additional organizations in more than 50 countries.

The vast majority of CEB's sales of its Core Product and Solutions, over 95%, occur outside of Virginia. The Commonwealth accounts for less than 5% of CEB's gross revenue. For the three years at issue, CEB earned $1.76 billion in total sales. Of that total, Virginia accounted for about $66 million.

For the tax years in question,

> [T]he majority (more than 50%) of CEB's employees who developed and improved the content integrated into the online components of CEB's products, and the costs of performance associated with developing and improving that content, were located in Arlington, Virginia.

Aside from "live learning events, executive networking, and customized advisory support," the entirety of the content "developed and integrated into the online components of the Core Product was housed on CEB's servers located in Arlington, Virginia." These "servers were managed and/or controlled by CEB's Information Technology function located in Arlington, Virginia."

II.    FORMULARY APPORTIONMENT UNDER VIRGINIA LAW.

Like a majority of States, Virginia imposes a corporate income tax. Code § 58.1-400 *et seq.* Virginia employs a formula to determine which portion of a corporation's income it can properly tax.

> Because tracing income earned by an interstate business to its geographic origin based on some type of separate accounting methodology presents enormous practical problems (and is arguably incoherent in theory), states have long used the method of formulary apportionment to determine the amount of income earned by multistate corporations within their borders.

Bradley W. Joondeph, *The Meaning of Fair Apportionment and the Prohibition on Extraterritorial State Taxation*, 71 Fordham L. Rev. 149, 155 (2002).

Since 1960, Virginia has adhered to the approach recommended by the National Conference of Commissioners on Uniform State Laws in 1957 in a model statute. *See* 1960 Acts

ch. 442.[1]  This model statute is the Uniform Division of Income for Tax Purposes Act, or

UDITPA.  UDITPA was drafted to address the fact that States had adopted "various formulae for

determining the amount of income to be taxed, and the differences in the formulae produce

inequitable results."  Uniform Division of Income for Tax Purposes Act, Prefatory Note, 3

(1957).  UDITPA sought to provide "a uniform method of division of income for tax purposes

among the several taxing jurisdictions."  *Id.*[2]

Virginia's UDITPA-based statute employs a three-factor formula to determine the taxable

income of a corporation.  Code § 58.1-408.  Many States employ a similar approach.  *See* Steven

Maguire, Congressional Research Service, State Corporate Income Taxes:  A Description and

Analysis at 4 (2006) (hereafter "State Corporate Income Taxes") ("Typically, three factors of

economic activity are used in the apportionment formula to measure the economic presence of a

firm in a state:  the percentage of property, the percentage of sales, and the percentage of

payroll.").  In Virginia, the numerator of the fraction consists of three factors:  a payroll factor, a

property factor, and a double-weighted sales factor.  Code § 58.1-408.  The denominator is four.

*Id*.  "In practice, there is relatively little controversy surrounding the [property and payroll

factors]."  Walter Hellerstein, *State Taxation of Electronic Commerce*, 52 Tax L. Rev. 425, 476

(1997).

---

[1] In 1999, Virginia adopted a double-weighted sales factor.  1999 Acts chs. 158, 186.

[2] The Multistate Tax Compact, a model law drafted in 1966 by a group of State officials, incorporates UDITPA nearly verbatim in Article IV of that Compact.  Some States adopted UDITPA directly into their statutes, while other States enacted the Multistate Tax Compact.  Shirley Sicilian, Multistate Tax Compact Article IV Recommended Amendments 1-2 (May 3, 2012).

The sales factor is based on the ratio of a corporation's "sales . . . in the Commonwealth" to its total "sales . . . everywhere." Code § 58.1-414. The sales factor varies depending on whether the property is tangible or intangible. For *tangible* personal property, Virginia's sales factor attributes the income from the sale to the source of the revenue, *i.e.* where the customer is located. Code § 58.1-415. This approach, modeled on UDITPA § 16, is known as destination-based, or market-based, sourcing. Virginia modeled the sales factor for sales of *intangible* personal property, including services like CEB's Core Product, on UDITPA § 17. Virginia includes sales of intangible property as part of income if:

> 1. The income-producing activity is performed in the Commonwealth; or
>
> 2. The income-producing activity is performed both in and outside the Commonwealth and a greater portion of the income-producing activity is performed in the Commonwealth than in any other state, based on costs of performance.

Code § 58.1-416.[3] Aside from minor textual adjustments and recodification, Virginia has retained this sales factor for services for nearly 60 years. *See* 1960 Acts ch. 442.

Applying this long-accepted "costs of performance" formula for sales of services means that the Tax Department allocated nearly 100% of CEB's gross receipts to Virginia. This allocation occurred because the service CEB provides was developed in Virginia by CEB's Virginia employees, and its product is stored on servers located in Virginia.

---

[3] Code § 58.1-416 was amended in 2018, by adding three new subsections, (B), (C), and (D), and placing the language from the previous version of the statute under a new subsection (A). *See* 2018 Acts ch. 807. The amendments did not change the relevant language. We cite to the version of the statute in effect during the tax years in question.

4

III.    OTHER STATES ABANDON "COST OF PERFORMANCE" SOURCING.

UDITPA's, and, therefore, Virginia's, "costs of performance" sales factor has faced

mounting criticism.  *See, e.g.*, John A. Swain, *Reforming the State Corporate Income Tax: A*

*Market State Approach to the Sourcing of Service Receipts*, 83 Tul. L. Rev. 285, 289 (2008).

UDITPA was adopted in 1957.  It "was written against the backdrop of an economy dominated

by mercantile and manufacturing enterprises."  *Id.* at 287.

> The U.S. economy, however, has changed dramatically since that
> time.  Production has shifted steadily from goods to services and
> intangibles, and the forces of globalization, spurred by the
> revolution in communications technology, now allow many more
> goods and services to be supplied remotely.  This puts tremendous
> pressure on division of income rules that were developed in
> another era.

*Id.*[4]

Virginia has repeatedly studied whether to alter its apportionment formula for services,

but, to date, the General Assembly has not changed it.  *See* John P. Josephs, Jr., *Virginia's*

*Apportionment Formula*, Presented to the Joint Subcommittee Studying the Benefits of Adopting

a Single Sales Factor (September 30, 2008); Joint Legislative Audit and Review Commission,

Report to the Governor and the General Assembly of Virginia, *Review of Virginia's Corporate*

*Income Tax System* (November 2010).  Several bills have been introduced to that effect, but they

have not passed.  *See* H.B. 1604, Va. Gen. Assem. (Reg. Sess. 2011), S.B. 1006, Va. Gen.

---

[4] "In 1960, 42 percent of U.S. wages and salaries were earned in the goods-producing sector (manufacturing, mining, construction, and agriculture)" of the economy.  In 2000, the share had fallen to 24%.  The portion of personal consumption dollars spent on services rose during this same period from 41% to 58%.  Robert Tannenwald, *Are State and Local Revenue Systems Becoming Obsolete?*, 24 State Tax Notes 143, 146 (2002).

Assem. (Reg. Sess. 2011), H.B. 2253, Va. Gen. Assem. (Reg. Sess. 2013), H.B. 442, Va. Gen.

Assem. (Reg. Sess. 2014).

A growing number of States have revisited their method of apportioning income from the sale of services. "The cost-of-performance method is waning, and market sourcing is taking its place." Douglas A. Wick, *A Categorization of State Market Sourcing Rules*, 74 State Tax Notes 351 (2014).

> [I]n recent years states have been moving away from the traditional cost-of-performance approach for sourcing revenue from services and adopting a market-based sourcing approach. Under this approach, service receipts are sourced to the location of the customer that receives the benefit of the service, rather than to the state where the service is performed.

Chuck Jones, *et al.*, *Addressing the Impact of Trend in States to Source Financial Services Fee Income by Using Market-Based Approach*, 23 J. Tax'n F. Inst. 29, at *3 (Nov./Dec. 2009).[5]

As States revise their apportionment formulas, however, they are not doing so in a uniform manner. Some States tax services where the benefit is received, others where the service is delivered, and still others where the receipts are derived. *See* Wick, 74 State Tax Notes 351, at *4-6; *see also* Sicilian, *supra* note 2, at 19-20. Still other States have modified

---

[5] In 2006, the National Conference of Commissioners on Uniform State Laws proposed a study to review UDITPA for possible revisions. In response, in 2012, the Multistate Tax Commission ("Commission") recommended a number of changes to UDITPA, and in particular to the apportionment formula for services. Sicilian, Multistate Tax Compact Article IV Recommended Amendments at 18-24. In July 2015, the Commission voted to adopt the Revised Model Compact Article IV, which addresses the apportionment of income. *See* Brian Hamer, Hearing Officer Report, Synopsis and Recommendations on Proposed Draft Amendments to the Commission's Model General Allocation and Apportionment Regulations 6 (May 1, 2016), http://www.mtc.gov/Uniformity/Project-Teams/Section-17-Model-Market-Sourcing-Regulations (last visited November 26, 2018). On February 24, 2017, the Commission voted to adopt draft amendments to the Commission's Model General Allocation and Apportionment Regulations. *See id*.

their apportionment rules for specific industries. *Id.* at 20. These divergent approaches on the sales factor expose corporations to potential or actual multiple taxation.

According to the parties' stipulation, approximately one third of the States where CEB does business use the same "'costs of performance' sales factor sourcing rule used by Virginia." A number of other States, however, included the income from CEB sales in their sales factor. As a result of this overlap between other States' apportionment formulas and Virginia's formula, CEB has "paid tax on a multistate basis on an apportioned amount of income that exceeded 120 percent of CEB's nationwide income." For example, according to the parties' stipulation, for the year 2013,

> CEB assigned 9.6 percent of its sales (or just over $65 million of revenue) to California to reflect its customer base there, and CEB also assigned these sales to the Commonwealth under the Statutory Method. Thus, CEB's taxes in Virginia and California were based in part on the same $65 million of revenue from customers located in California.

IV.     THE RELIEF PROVISION.

The Code contains a relief provision that allows a taxpayer to seek redress from the Tax Department when "the method of allocation or apportionment hereinbefore prescribed . . . has operated or will so operate as to subject [a corporation] to taxation on a greater portion of its Virginia taxable income than is reasonably attributable to business or sources within this Commonwealth." Code § 58.1-421. A corporation seeking the benefit of this provision must file "a statement of its objections" with the Tax Department and propose an "alternative method [of taxation] as it believes to be proper under the circumstances." *Id.* If the Tax Department "concludes that the method of allocation or apportionment theretofore employed is in fact inapplicable or inequitable," then "it shall redetermine the taxable income by such other method of allocation or apportionment as seems best calculated to assign to the Commonwealth for

7

taxation the portion of the income reasonably attributable to business and sources within the Commonwealth." *Id.*

The Tax Commissioner has issued a regulation, 23 VAC § 10-120-280, that specifies when a method of allocation and apportionment is inapplicable or inequitable. This regulation specifies that a method will be found "inapplicable" only if it "produces an unconstitutional result under the particular facts and circumstances of the taxpayer's situation." 23 VAC § 10-120-280(B)(4)(a). A method is "inequitable" only if "[i]t results in double taxation of the income, or a class of income" and "[t]he inequity is attributable to Virginia, rather than to the fact that some other state has a unique method of allocation and apportionment." 23 VAC §§ 10-120-280(B)(4)(b)(1) and (2).

V.    THE PROCEEDINGS BELOW.

CEB sought an administrative refund from the Tax Department under Code § 58.1-1823, and asked for apportionment relief under Code § 58.1-421. The Tax Department did not act within three months after the refund claim was filed, thereby allowing CEB to seek relief in court. *See* Code § 58.1-1823. It did so, filing a complaint in the Arlington County Circuit Court in 2016. As relevant here, the complaint alleged that the assessments violated the Commerce Clause and the Due Process Clause of the United States Constitution. In addition, CEB alleged that the assessments were "inequitable" under Code § 58.1-421 and 23 VAC § 10-120-280. CEB requested a redetermination of its income tax by using the customer's location, the same formula as is employed for sales of tangible personal property, to allocate sales. Under its proposed method, sales would be sourced to the billing address of the customer instead of to Virginia based on the cost of performance. The parties submitted a joint motion for summary judgment

8

on stipulated facts.  The circuit court found in favor of the Tax Department.  This appeal

followed.

ANALYSIS

I.  THE TAX DEPARTMENT'S APPORTIONMENT OF CEB'S INCOME TAX IS IN ACCORD
    WITH CONSTITUTIONAL REQUIREMENTS.

CEB argues that the Tax Department unconstitutionally apportioned its income in 2011,

2012, and 2013, in violation of the "dormant" Commerce Clause and the Due Process Clause of

the Fourteenth Amendment.  We review *de novo* the legal question of whether a statute has been

constitutionally applied by a governmental agency.  *Dulles Duty Free, LLC v. Cnty. of Loudoun*,

294 Va. 9, 13 (2017).

The Due Process Clause of the Fourteenth Amendment provides that "[n]o . . . State shall

deprive any person of life, liberty, or property, without due process of law."  U.S. Const. amend

XIV, § 1.  "For a State to tax income generated in interstate commerce, the Due Process Clause

of the Fourteenth Amendment imposes two requirements:  a 'minimal connection' between the

interstate activities and the taxing State, and a rational relationship between the income attributed

to the State and the intrastate values of the enterprise."  *Mobil Oil Corp. v. Comm'r of Taxes of

Vt.*, 445 U.S. 425, 436-37 (1980).

The Commerce Clause provides that "The Congress shall have Power . . . [t]o regulate

Commerce with foreign Nations, and among the several States, and with the Indian Tribes."

U.S. Const. art. I, § 8, cl. 3.  "Although the Constitution contains language explicitly limiting

state interference with *foreign* commerce, nowhere does it explicitly limit state interference with

*interstate* commerce."  1 Laurence H. Tribe, American Constitutional Law 1029 (3rd ed. 2000)

(emphasis in original).  The Supreme Court's doctrine in this area is "traceable to the

Constitution's *negative implications*."  *Id.* (emphasis in original).  "Although the language of

9

th[e] Clause speaks only of Congress' power over commerce, the Court long has recognized that it also limits the power of the States to erect barriers against interstate trade." *Dennis v. Higgins*, 498 U.S. 439, 446 (1991) (internal quotation marks and citation omitted). The Court has conceived of the Commerce Clause as not only "an affirmative grant of power to Congress to regulate interstate and foreign commerce" but also as a "self-executing limitation on the power of the States to enact laws imposing substantial burdens on [interstate] commerce." *South-Central Timber Dev., Inc. v. Wunnicke*, 467 U.S. 82, 87 (1984).

"The Commerce Clause . . . precludes the application of a state statute to commerce that takes place wholly outside of the State's borders, whether or not the commerce has effects within the State." *Edgar v. MITE Corp.*, 457 U.S. 624, 642-43 (1982) (plurality opinion). A State may not "tax value earned outside [of] its borders," *Container Corp. of Am. v. Franchise Tax Bd.*, 463 U.S. 159, 164 (1983), and is limited to taxing "only its fair share of an interstate transaction." *Goldberg v. Sweet*, 488 U.S. 252, 261 (1989).

A tax does not infringe the dormant Commerce Clause if it:

(1) applies to an activity with a substantial nexus to the taxing state;

(2) is fairly apportioned;

(3) does not discriminate against interstate commerce; and

(4) is fairly related to services or benefits provided by the state.

*Complete Auto Transit, Inc. v. Brady*, 430 U.S. 274, 279 (1977). In this case, there is no dispute that the tax here satisfies parts (1), (3), and (4) of the *Complete Auto* test. The crux of the disagreement between the parties is whether the tax is fairly apportioned. CEB notes that "[b]oth the Commerce and Due Process Clauses require a state income tax to be fairly apportioned" and that the "fair apportionment analysis is substantially the same under the Commerce and Due

10

Process Clauses." CEB Br. 23 n.10.  We agree and proceed accordingly.  *See Container Corp.*, 463 U.S. at 169 (setting forth the same test for a fair apportionment formula under both the Due Process Clause and the Commerce Clause).

"[T]he central purpose behind the apportionment requirement is to ensure that each State taxes only its fair share of an interstate transaction." *Goldberg*, 488 U.S. at 260-61.  To be fairly apportioned, a tax must be both internally and externally consistent. *Id.*  The parties agree that Virginia's method of assessing CEB's corporate income is internally consistent.  The remaining question, therefore, is whether the tax is externally consistent.

Of the two, the external consistency requirement is the "more difficult." *Container Corp.*, 463 U.S. at 169.  "[T]he external consistency test is essentially a practical inquiry." *Goldberg*, 488 U.S. at 264.  To be constitutionally fair, "the factor or factors used in the apportionment formula must actually reflect a reasonable sense of how income is generated." *Container Corp.*, 463 U.S. at 169.  "External consistency . . . looks . . . to the economic justification for the State's claim upon the value taxed, to discover whether a State's tax reaches beyond that portion of value that is fairly attributable to economic activity within the taxing State." *Oklahoma Tax Comm'n v. Jefferson Lines, Inc.*, 514 U.S. 175, 185 (1995); *see also Goldberg*, 488 U.S. at 262 ("The external consistency test asks whether the State has taxed only that portion of the revenues from the interstate activity which reasonably reflects the in-state component of the activity being taxed.").  A court must strike down an apportionment formula as externally inconsistent if the taxpayer proves by "clear and cogent" evidence "that the income attributed to the State is in fact out of all appropriate proportion to the business transacted . . . in that state, or has led to a grossly distorted result." *Moorman Mfg. Co. v. Bair*, 437 U.S. 267, 274 (1978) (citation omitted).

11

The Supreme Court has recognized that the existence of duplicative taxation does not, by itself, violate the Constitution. The Court has noted that "some risk of duplicative taxation exists whenever the States in which a corporation does business do not follow identical rules for the division of income." *Id.* at 278. The Court has so far declined to undertake "extensive judicial lawmaking" that would be required to "prohibit[] any overlap in the computation of taxable income by the States." *Id.*; *see also Container Corp.*, 463 U.S. at 171 (declining to undertake the "essentially legislative" task of establishing a "single constitutionally mandated method of taxation."). So long as the State's method of apportionment is itself fair, it does not violate the Constitution.[6] *Moorman Mfg.*, 437 U.S. at 280-81; *see also Comptroller of the Treasury v. Wynne*, 575 U.S. ___, 135 S. Ct. 1787, 1804 (2015) (characterizing *Moorman* as "distinguishing 'the potential consequences of the use of different formulas by the two States,' which is not prohibited by the Commerce Clause, from discrimination that 'inhere[s] in either State's formula,' which is prohibited").

In a union comprised of 50 sovereign States, it is nearly inevitable that States will devise differing taxation schemes and, indeed, that is the case. *See* Maguire, State Corporate Income Taxes, at 6 (listing various apportionment schemes). The Supreme Court has given States "wide latitude" in adopting apportionment formulas, *Moorman Mfg.*, 437 U.S. at 274, upholding, for example, both single property factor apportionment, *Underwood Typewriter Co. v. Chamberlain*, 254 U.S. 113, 120-21 (1920), and single sales factor apportionment. *Moorman Mfg.*, 437 U.S. at 275. Some States, like Virginia, have adhered to longstanding apportionment formulas while

---

[6] Similarly, with respect to the internal consistency test, not at issue here, the Court has drawn a "critical distinction" between "discriminatory tax schemes," which are constitutionally problematic under the dormant Commerce Clause, and "double taxation that results only from the interaction of two different but nondiscriminatory tax schemes." *Comptroller of the Treasury v. Wynne*, 575 U.S. ___, 135 S. Ct. 1787, 1804 (2015).

others, in an effort to attract corporate investment, have adopted formulas that eliminate the property and payroll factors. *See* Swain, 83 Tul. L. Rev. 285, at 289-90. "[T]he variability in the allocation and apportionment of corporate income from state to state" inescapably creates "gaps and overlaps in taxation." Maguire, State Corporate Income Taxes, at 16. Some income will escape taxation altogether, a phenomenon known as "nowhere income." *Id.* at 5. At times, however, as occurred here, differing apportionment formulas will result in double taxation of the same income. *Moorman Mfg.*, 437 U.S. at 278.

We conclude that CEB did not suffer from an unconstitutional apportionment of its income. We can find nothing in the precedent of the United States Supreme Court interpreting the dormant Commerce Clause or the Due Process Clause that requires one of two taxing States to "recede simply because both have lawful tax regimes reaching the same income." *Wynne*, 135 S. Ct. at 1813 (Ginsburg, J., dissenting). The external consistency test "asks whether the State has taxed only that portion of the revenues from the interstate activity which reasonably reflects the in-state component of the activity being taxed." *Goldberg*, 488 U.S. at 262. In the present case, the stipulated facts establish that the content for CEB's Core Product was developed by CEB employees working in Virginia. The servers on which the product resides are located in Virginia. Each time a customer uses CEB's Core Product, the customer reaches into Virginia to consult materials developed in Virginia and stored in Virginia. The Tax Department's apportionment of income did not "reach[] beyond that portion of value that is fairly attributable to economic activity within the taxing State." *Jefferson Lines*, 514 U.S. at 185. "[T]he central purpose [of apportionment] is to ensure that each State taxes only its fair share of an interstate transaction." *Id.* at 184 (quoting *Goldberg*, 488 U.S. at 260-61). Virginia's apportionment method satisfies the constitutional standard.

CEB acknowledges that double taxation, by itself, does not render an unconstitutional result. It argues, however, that an apportionment is unconstitutional when it "wholly disregards the existence of interstate commerce, and that thereby produces a *much* higher apportionment of taxable income *and* substantial double taxation." CEB Reply Br. at 4. (emphasis in original). Whatever the policy merits of this proposal may be, it is not a standard the Supreme Court has embraced. Virginia's apportionment method for taxing sales of services satisfies the requirements of existing precedent from the Supreme Court. As noted above, Virginia's taxation scheme "reasonably reflects the in-state component of the activity being taxed" - nothing more is required. *Goldberg*, 488 U.S. at 262.

Our conclusion is consistent with *Western Live Stock v. Bureau of Revenue*, 303 U.S. 250 (1938). Although the decision predates the four-factor *Complete Auto* test, the Court has never questioned or overruled the case. New Mexico imposed a gross receipts tax on advertising revenues for a magazine distributed within and without the State. The magazine, a livestock trade journal, was wholly prepared, edited, and published within New Mexico. The taxpayer's only office and place of business was located in New Mexico. *Id.* at 252. The magazine solicited advertisements outside New Mexico. *Id.* at 252-53. It received payments in its offices in New Mexico. *Id.* at 253. The Supreme Court upheld the tax against a challenge that it imposed an unconstitutional burden on interstate commerce. The Court observed that "[a]ll the events upon which the tax is conditioned – the preparation, printing and publication of the advertising matter, and the receipt of the sums paid for it – occur in New Mexico and not elsewhere." *Id.* at 260.

Finally, we conclude that Virginia's apportionment formula does not create a "grossly distorted" result. In *Norfolk & W. Ry. v. Missouri State Tax Commission*, 390 U.S. 317, 326

(1968), the Supreme Court concluded that the taxpayer had met its "heavy burden" of proving that Missouri's ad valorem tax assessment of the railway's rolling stock violated the Due Process and Commerce Clauses. The railway established that the value of its rolling stock in the State never materially exceeded $7,600,000. *Id.* at 321-22. The State's formula, which assumed "an enhanced value [to the rolling stock] in the State through its organic relation to the [interstate] system," yielded an assessed value of $19,981,000. *Id.* at 322. The Court found that the tax challengers had borne the burden of showing that the State's method "has resulted in such gross overreaching, beyond the values represented by the intrastate assets purported to be taxed, as to violate the Due Process and Commerce Clauses of the Constitution," while "the State has made no effort to offset the convincing case that they have made." *Id.* at 326. Of significance to the Court was the fact that the State "made no effort to show such value [to the interstate system] or to measure the extent to which it might be attributed to the rolling stock in the State." *Id.* at 328. In the present case, by contrast, the facts establish that the tax imposed on CEB's services rests upon the labor of employees in Virginia who developed the product CEB sells, which is located in servers stored in Virginia. The gross distortion and lopsided factual record present in *Norfolk & Western Railway v. Missouri State Tax Commission* are simply not present in this case.

II.     THE REGULATION ALLOWING RELIEF DOES NOT APPLY UNDER ITS PLAIN LANGUAGE.

A taxpayer is entitled to relief under Code § 58.1-421 if the statutory "method of allocation or apportionment" is "inequitable." The Tax Department's implementing regulation, 23 VAC § 10-120-280(B)(4)(b), provides that the statutory method is "inequitable" when "(1) it results in double taxation of the income, or a class of income, of the taxpayer; and (2) the inequity is attributable to Virginia, rather than to the fact that some other state has a unique method of allocation and apportionment." CEB argues in its second assignment of error that it is

15

entitled to benefit from this relief provision because the statutory method results in inequitable apportionment of its income.

The taxpayer bears the burden of proving that the Tax Department's assessment is contrary to law. *Dep't of Taxation v. Lucky Stores, Inc.*, 217 Va. 121, 127 (1976). Where a regulation is unambiguous, we will interpret it according to its plain language. *Mathews v. PHH Mortg. Corp.*, 283 Va. 723, 738 (2012); *see also Avante at Roanoke v. Finnerty*, 56 Va. App. 190, 201-02 (2010). There is no question that the statutory method, when applied alongside the apportionment methods employed by a number of other States, has resulted in the double taxation of a portion of CEB's income. Therefore, CEB satisfies the first requirement of the regulation.

The second requirement contains two criteria: the Taxpayer must show both that the inequitable apportionment is "attributable to Virginia," and that it is not attributable "to the fact that some other state has a unique method of allocation and apportionment." 23 VAC § 10-120-280(B)(4)(b).

For the first criterion, the key term is "attributable." In *Nielsen Co. (US), LLC v. County Board of Arlington County*, 289 Va. 79, 94 (2015), we gave this undefined term its "ordinary meaning, in light of the context in which it is used," and reasoned that "[a]ttribute," when used as a verb, has the ordinary meaning of "to explain as caused or brought about by" and "regard as occurring in consequence of or on account of." *Id.* (citing Webster's Third New International Dictionary 142 (1993)).

Applying this definition, our overview of the history of UDITPA and States' efforts to reform their apportionment rules makes it clear that any double taxation is not "attributable" to Virginia. CEB's double taxation is "attributable" to changes adopted more recently by other

16

States in their apportionment formulas, and in particular to the increased trend of using single-factor sales apportionment. Virginia adopted its apportionment formula, modeled after UDITPA, as part of an effort to provide "a uniform method of division of income for tax purposes among the several taxing jurisdictions." Uniform Division of Income for Tax Purposes Act, Prefatory Note at 3. The Commonwealth has adhered to its formula for nearly 60 years. CEB's double taxation did not "occur[] in consequence of or on account of" *Virginia* law.

For the second criterion, the key term is "unique." Under the plain language of the regulation, CEB is not entitled to relief unless it can show that the double taxation is not attributable to "another state's unique method of allocation and apportionment." 23 VAC § 10-120-280(B)(4)(b). Determining whether a State has adopted "a unique method of allocation and apportionment" requires more than considering whether, at a high level of abstraction, a State has adopted a cost of production versus a market sourcing formula. A "method" is "a procedure or process for attaining an object." Webster's Third New International Dictionary 1422 (1993). "Cost of production" or "market sourcing" are broad descriptive labels, useful to be sure, but such labels do not constitute the specific "method of allocation and apportionment" for assessing a corporation's income tax. Under 23 VAC § 10-120-280(B)(4)(b), we must examine the specific details of another State's "method of allocation and apportionment" to determine whether it is "unique."

The record fails to establish whether the sourcing methods adopted by other States are "unique." It does not appear that an entity such as the National Conference of Commissioners on Uniform State Laws has developed these formulas for adoption by the States. Rather, an examination of the apportionment formulas themselves, and their treatment in academic

17

literature, indicates that each State has generated a statute that is unique to that particular State and, not infrequently, additional voluminous and complex implementing regulations.

While many States have adopted sourcing methods that can be described as market based, these methods are far from uniform and often differ substantially. Broadly speaking, States that have shifted to market sourcing have adopted three approaches, with some taxing services where the benefit is received, others where the service is delivered, and still others where the receipts are derived. *See* Wick, 74 State Tax Notes 351, at *4-6. Even within these three approaches, the specifics of each method vary significantly.

Several examples illustrate the point. Both Wisconsin and California employ the "benefits received" approach. In its sales factor, California includes sales of services "to the extent the purchaser of the service received the benefit of the services in [California]." West's Ann. Cal. Rev. & T. Code § 25136(a)(1). Extensive regulations provide further guidance. These regulations "anticipate that determining the location where the benefit of a service is received can be difficult," and provide a complex framework to aid in the determination. *See* Wick, 74 State Tax Notes 351, at *5. The regulations draw a distinction between services provided to an individual and services provided to a business. Cal. Code Regs. tit. 18, §§ 25136-2(c)(1) and (2). The regulations specify that the "[b]enefit of a service is received" in "the location where the taxpayer's customer has either directly or indirectly received value from delivery of that service." Cal. Code Regs. tit. 18, § 25136-2(b)(1). If the contract or the taxpayer's books and records indicate that the benefit was received in California, the regulations presume that the benefit is received in California - regardless of the customer's billing address. Cal. Code Regs. tit. 18, § 25136-2(c)(2)(A). A taxpayer can overcome that presumption by showing, based on a preponderance of the evidence, that the location (or locations) indicated by the contract or the

taxpayer's books and records was not the actual location where the benefit of the service was received.  *Id*.  If the contract or the taxpayer's books and records do not indicate where the benefit was received, the location must be reasonably approximated.  Cal. Code Regs. tit. 18, § 25136-2(c)(2)(B).  If the location where the benefit of the service is received cannot be determined and reasonable approximation is not possible, the location where the benefit was received is presumed to be in California if "the location from which the taxpayer's customer placed the order for the service is in this state."  Cal. Code Regs. tit. 18, § 25136-2(c)(2)(C).  If none of the previously stated tests apply, California law will deem the benefit of the service to be in California if the customer's billing address is in California.  Cal. Code Regs. tit. 18, § 25136-2(c)(2)(D).

For Wisconsin, which adopted single factor sales apportionment beginning in 2008, receipts from services are Wisconsin receipts "if the purchaser of the service received the benefit of the service in this state."  Wis. Stat. Ann. § 71.25(9)(dh)(1).  The benefit of a service is received in the State if

> a.  The service relates to real property that is located in this state.
> b.  The service relates to tangible personal property that is delivered directly or indirectly to customers in this state.
> c.  The service is purchased by an individual who is physically present in this state at the time that the service is received.
> d.  The service is provided to a person engaged in a trade or business in this state and relates to that person's business in this state.
>
> 3.  Except as provided in subd. 4. if the purchaser of a service receives the benefit of a service in more than one state, the gross receipts from the performance of the service are included in the numerator of the sales factor according to the portion of the service received in this state.

19

*Id.* at (dh)(2). Unlike California, the implementing regulation provides no additional guidance. *See* Wis. Admin. Code, Tax § 2.39(6)(f). Wisconsin does not provide alternative domicile, customer address, or billing address rules.

Other States, including Alabama and Illinois, use the "services delivered" approach to market based sourcing. Alabama employs a three factor assessment formula that includes property, payroll, and double weighted sales factors. Ala. Code Ann. § 40-27-1, art. IV(9). Sales means "all gross receipts of the taxpayer not allocated under paragraphs of this article." Ala. Code Ann. § 40-27-1, art. IV(1)(g). Sales are considered to take place in Alabama "if and to the extent the service is delivered to a location in this state." Ala. Code Ann. § 40-27-1, art. IV(17)(a)(3). Implementing regulations draw a distinction between sales to an individual and sales to a business enterprise. Ala. Admin. Code R. 810-27-1-.17. If a sale is to a business enterprise, the regulations draw a further distinction between a service with a "substantial connection to a specific geographic location," such as training or cleaning services, and services that do "not have a substantial connection to a specific geographic location," such as providing accounting services. *Compare* Ala. Admin. Code R. 810-27-1-.17(2)(b)(2), *with* Ala. Admin. Code R. 810-27-1-.17(2)(b)(3). If the service has a "substantial connection to a specific geographic location," then "the income shall be sourced to Alabama if the geographic location is in this state." Ala. Admin. Code R. 810-27-1-.17(2)(b)(2). If the service provided "does not have a substantial connection to a specific geographic location," the sale should be sourced to Alabama if the business is "commercially domiciled in Alabama." Ala. Admin. Code R. 810-27-1-.17(2)(b)(3). A business is domiciled in Alabama "if its principal place of business is in Alabama." *Id.*

Unlike Alabama's traditional three factor formula, Illinois employs a single factor sales formula. 35 Ill. Comp. Stat. Ann. § 5/304(a)(3)(C-5)(iv). Receipts from services provided to a business may be sourced only to a state where that business has a fixed place of business. *Id.* If the State where the services were delivered is not readily determinable, proxies such as the location of the customer's ordering office or billing address are used to determine where the service was received. *See id.* Regulations provide additional details concerning these sourcing rules. *See* Ill. Admin. Code tit. 86, § 100.3370 (2017).

CEB paid corporate income taxes on a portion of its sales to 23 States besides Virginia, including the four States mentioned above. CEB contends that "[t]he destination-based sourcing method used by these 23 other states . . . can in no sense be considered unique." CEB Br. at 35. Cursory investigation reveals, however, that each State has adopted its own distinctive method, even if those methods share some conceptual similarities.

> Today, there is no standard market sourcing rule akin to the cost-of-performance rule that used to be more prevalent. Instead, three categories of market sourcing rules exist: the benefits-received approach, the services-delivered approach, and the receipts-derived approach. And as demonstrated above, in each state, subtle differences in those approaches may exist.

Wick, 74 State Tax Notes 351, at *7. The fact that States have adopted, in conceptual terms, a market sourcing method does not resolve whether the actual method employed is "unique."

The taxpayer bears the burden of proving that the Tax Department's assessment is contrary to law. *Lucky Stores, Inc.*, 217 Va. at 127. The applicable regulation, 23 VAC § 10-120-280(B)(4)(b), forecloses relief if the "method" employed by another State is "unique." Our review of some of the methods employed by States that have taxed CEB's sales of services, illustrated above, suggests that the market sourcing methods employed by States for taxing the sale of a service differ in their details, often considerably. In short, the record establishes that a

21

number of States that subject CEB to corporate income tax use conceptually similar market

sourcing methods, but the record fails to establish whether those methods are unique.

Consequently, we are unable to conclude that the circuit court and the Tax Department erred in

declining to grant relief under the plain language of 23 VAC § 10-120-280(B)(4)(b).[7]

CONCLUSION

For these reasons, we will affirm the judgment of the circuit court.

*Affirmed.*

---

[7] Our resolution of the first two assignments of error obviates the need for us to address CEB's remaining assignment of error, which challenged the trial court's determination that the Tax Department was not required to implement CEB's proposed alternative method of apportionment.