COURT OF APPEALS OF VIRGINIA

UNPUBLISHED

Present:    Chief Judge Decker, Judges AtLee and Bernhard
Argued by videoconference

COMMONWEALTH OF VIRGINIA

MEMORANDUM OPINION* BY
v.        Record No. 1805-24-3          JUDGE RICHARD Y. ATLEE, JR.
                                        MARCH 25, 2025
PATRICK RAY WEBB

FROM THE CIRCUIT COURT OF ALLEGHANY COUNTY
Edward K. Stein, Judge

David A. Stock, Senior Assistant Attorney General (Jason S.
Miyares, Attorney General, on briefs), for appellant.

Jonathan B. Tarris (Tarris Law PLC, on brief), for appellee.


The Commonwealth filed this pre-trial appeal after the circuit court dismissed the indictment

against Patrick Ray Webb. Webb was arrested for possession of a firearm while simultaneously

possessing a Schedule I or II controlled substance, in violation of Code § 18.2-308.4. He waived his

right to indictment by a grand jury and filed a pre-trial motion, asking the circuit court to find Code

§ 18.2-308.4 "invalid" under the Second Amendment to the United States Constitution. Applying

the framework set out in *New York State Rifle & Pistol Association v. Bruen*, 597 U.S. 1 (2022), and

*United States v. Rahimi*, 602 U.S. 680 (2024), the circuit court found that the statute did not have a

historical analogue and was therefore unconstitutional. Accordingly, it granted the motion and

dismissed the charge against Webb. The Commonwealth now appeals, arguing that the circuit court

erred in finding the statute unconstitutional. We agree and reverse.

---

* This opinion is not designated for publication. *See* Code § 17.1-413(A).

## I. BACKGROUND

Police officers executed a search warrant at a residence in Covington, Virginia. While doing so, officers detained and searched Webb. During the search of Webb, officers discovered on his person a firearm and a glass vial containing white powder. Webb allegedly identified the white powder as cocaine. Relevant here, officers arrested Webb for possession of a firearm while in possession of a Schedule I or II controlled substance in violation of Code § 18.2-308.4(B).

After a preliminary hearing, the general district court certified the charge for trial in the circuit court. In the circuit court, Webb waived his right to indictment by a grand jury. He filed a pre-trial motion asking the circuit court to find Code § 18.2-308.4 unconstitutional, arguing that the code section was "invalid" and that it was unconstitutional under the framework set out by the Supreme Court of the United States in *Bruen* and *Rahimi*. He argued that disarming an individual based solely on the possession of a controlled substance lacked a historical precedent. He also argued that the Commonwealth had failed to meet its burden of showing that the statute was "rooted in our nation's historical tradition of firearm regulation." The Commonwealth opposed the motion, contending that the statute was presumptively constitutional.

After a hearing on the motion, the circuit court issued a letter opinion. Applying the test in *Bruen*, the circuit court concluded that Code § 18.2-308.4(B) did not have a historical analogue. Thus, it found that the statute violated the Second Amendment and was unconstitutional, and it dismissed the charge against Webb.

The Commonwealth appealed pursuant to Code § 19.2-398(E).[1]

---

[1] In his reply brief, Webb raises an assignment of cross-error. He did not, however, file a separate notice of appeal as required. *See* Code § 18.2-401; Rule 5A:6. Therefore, we do not consider his assignment of cross-error.

## II. ANALYSIS

We review de novo whether the application of a criminal statute violates a defendant's constitutional rights. *Walker v. Commonwealth*, 302 Va. 304, 314 (2023). This includes "as applied" challenges to the constitutionality of a statute.[2] *See Shin v. Commonwealth*, 294 Va. 517, 526 (2017). In an as applied challenge, we examine the statute "in light of the facts of the case at hand." *Motley v. Va. State Bar*, 260 Va. 243, 247 (2000) (quoting *Maynard v. Cartwright*, 486 U.S. 356, 361 (1988)). "Challenging an enactment of the General Assembly is a 'daunting task,' as 'all actions of the General Assembly are presumed to be constitutional.'" *Watkins v. Commonwealth*, 83 Va. App. 456, 466 (2025) (quoting *Montgomery Cnty. v. Va. Dep't of Rail & Pub. Transp.*, 282 Va. 422, 435 (2011)). "This presumption is 'one of the strongest known to the law.'" *Ferguson v. Commonwealth*, 71 Va. App. 546, 558 (2020) (quoting *Boyd v. Cnty. of Henrico*, 42 Va. App. 495, 507 (2004) (en banc)).

The Second Amendment to the United States Constitution provides, "A well regulated Militia, being necessary to the security of a free State, the right of the people to keep and bear Arms, shall not be infringed." U.S. Const. amend. II. "'[T]he Second Amendment right is fully applicable to the States' through the Due Process Clause of the Fourteenth Amendment." *Ginevan v. Commonwealth*, 83 Va. App. 1, 8 (2024) (quoting *McDonald v. City of Chicago*, 561

---

[2] Virginia law "favors upholding the constitutionality of properly enacted laws." *Volkswagen of Am., Inc. v. Smit*, 279 Va. 327, 336 (2010). Thus, "[b]efore a litigant can mount a successful facial challenge to a statute, that litigant must first show 'that the statute in question is unconstitutional as applied to him.'" *Shin v. Commonwealth*, 294 Va. 517, 526 (2017) (quoting *Toghill v. Commonwealth*, 289 Va. 220, 228 (2015)). Because we find Code § 18.2-308.4 constitutional as applied to Webb, we do not address his facial challenge. Furthermore, any challenge to the facial validity of that statute would be unsuccessful because we determined in *Watkins v. Commonwealth*, 83 Va. App. 456 (2025), that Code § 18.2-308.4 was constitutional as applied to the facts of that case. *See Warren v. Commonwealth*, 69 Va. App. 659, 667 (2019) ("[A] litigant challenging the constitutionality of a statute 'can only succeed in a facial challenge by "establish[ing] that no set of circumstances exists under which the Act would be valid," *i.e.*, that the law is unconstitutional in all of its applications.'" (second alteration in original) (quoting *Wash. State Grange v. Wash. State Republican Party*, 552 U.S. 442, 449 (2008))).

U.S. 742, 744 (2010) (plurality opinion)).  Our opinions in *Ginevan* and *Watkins* reviewed the recent changes to the Second Amendment analysis after the United States Supreme Court's decisions in *Bruen* and *Rahimi*.

The first step in the analysis of the constitutionality of a statute under the Second Amendment is to "ask if 'the Second Amendment's plain text covers an individual's conduct.'" *Watkins*, 83 Va. App. at 467 (quoting *Ginevan*, 83 Va. App. at 9).  "If so, 'the Constitution presumptively protects that conduct,'" and we move on to the next step in the analysis.  *Ginevan*, 83 Va. App. at 9 (quoting *Bruen*, 597 U.S. at 17).  Under the second step of the *Bruen* analysis, "if the government wishes to regulate presumptively protected conduct, it must 'demonstrate that the regulation is consistent with this Nation's historical tradition of firearm regulation.'"  *Id.* at 9-10 (quoting *Bruen*, 597 U.S. at 17).  "In evaluating whether a regulation is consistent with our Nation's historical tradition of regulating firearms, '[a] court must ascertain whether the new law is "relevantly similar" to laws that our tradition is understood to permit, "apply[ing] faithfully the balance struck by the founding generation to modern circumstances."'"  *Watkins*, 83 Va. App. at 467 (alterations in original) (quoting *Rahimi*, 602 U.S. at 692).

But "it is important to note that *Bruen* does not require a 'historical twin' in order to permit governmental restrictions—only a historical analogue."  *Id.* (quoting *Ginevan*, 83 Va. App. at 27); *see also Rahimi*, 602 U.S. at 701 ("As we said in *Bruen*, a 'historical twin' is not required." (quoting *Bruen*, 597 U.S. at 30)).  "Why and how the regulation burdens the right are central to this inquiry."  *Watkins*, 83 Va. App. at 468 (quoting *Ginevan*, 83 Va. App. at 13).  "In other words, a regulation passed for a similar purpose, and that imposes a similar burden, may constitute an appropriate analogue."  *Id.*  But the government "need not show that the current law is a 'dead ringer' for some historical analogue."  *Rahimi*, 602 U.S. at 708-09 (Gorsuch, J., concurring) (quoting *Bruen*, 597 U.S. at 30).  In evaluating the historical tradition, we examine

"regulations at the time the Second Amendment was adopted in 1791, or at the time the Second Amendment was incorporated against the states in 1868." *Watkins*, 83 Va. App. at 469.

In *Ginevan*, we applied the *Bruen* framework to analyze the constitutionality of Code § 18.2-308.2, which prohibits the possession of a firearm by a convicted felon. *Ginevan*, 83 Va. App. at 27. There, the defendant, a felon, was involved in a domestic disturbance where he allegedly pointed a shotgun at a woman. *Id.* at 5. He admitted to possessing a firearm, but he denied that he had pointed it at the woman. *Id.* The defendant challenged the constitutionality of Code § 18.2-308.2 as applied to him, arguing that the provision was inconsistent with the "[n]ation's historical tradition of firearm regulation." *Id.* at 6. He argued that the earliest version of that statute was not enacted until 1961, and, before that, it applied only to felons convicted of specified crimes. *Id.*

We disagreed with the defendant, finding that after "[a] review of English history, the American period prior to the Founding, and our post-civil war era demonstrates persuasively that restrictions on gun possession were broadly permitted against those who were judged to pose a danger to the public." *Id.* at 27. In coming to that conclusion, we looked first to English laws disarming those who declined to join the Church of England or those considered "dangerous to the Peace of the Kingdome." *Id.* at 23 (quoting An Act Declaring the Rights and Liberties of the Subject and Settling the Succession of the Crown, 1 W & M., Sess. 2, c. 2, § 7 (1689)). Those laws spawned similar laws in the United States, including laws disarming those deemed "dangerous," such as those who would not swear allegiance to the United States or those considered a threat. *Id.* at 21-28 (summarizing and analyzing laws). Though we did not find an outright ban on possession of firearms based on felony status, the historical record was a sufficient analogue under the *Bruen* standard. *Id.* at 26-27. Thus, we found that the statute was constitutional. *Id.* at 27.

In *Watkins*, we considered an as-applied challenge to Code § 18.2-308.4, the same statute as at issue here, which prohibits the simultaneous possession of both a controlled substance and a firearm. *Watkins*, 83 Va. App. at 473. There, the defendant was arrested outside his house in actual possession of a shotgun. *Id.* at 465. After arresting him for public intoxication, police searched him and "found a plastic baggie of white powder, which later tested positive for cocaine." *Id.* When questioned by officers about the substance, the defendant responded, "You know I do coke." *Id.* He was arrested for violating Code § 18.2-308.4, and he challenged the statute, arguing there were no historical analogues for the statute. *Id.*

We disagreed, finding that Code § 18.2-308.4 was constitutional as applied to the defendant. *Id.* at 482. We recognized that an exact match was not required, and we found that there were sufficient comparable regulations to support the disarming of "a current drug user." *Id.* at 481. We found support for Code § 18.2-308.4 in "three categories of historical regulations:" "(1) laws that generally prohibited people from using firearms in a dangerous manner; (2) prohibitions on intoxicated persons carrying guns; and (3) laws that prohibited persons with mental illness from possessing firearms." *Id.* at 478. The first category "constitute the broader set of laws within which specific prohibitions on firearms for intoxicated persons or persons with mental illness from carrying guns are embedded." *Id.* The second category, prohibiting the use of intoxicants and firearms, "is thin on its own." *Id.* at 479. But those laws are nevertheless evidence "of the more broadly established tradition of disarming dangerous individuals." *Id.* at 480. We found that comparing the "how" and "why" of these regulations had a "common thread" with the current statute, which is a "legislative response to the heightened danger to the public arising from the possession of a gun by an individual who, because of a mental condition or due to current use of alcohol or illegal drugs, may be less stable than we rightfully expect those who possess and use guns to be." *Id.* at 478 (quoting *United*

*States v. Lewis*, 690 F. Supp. 3d 1235, 1241 (W.D. Okla. 2023)). We found that the combination of these historical provisions constituted a sufficient analogue for purposes of the *Bruen* test, though we left for another day the question of "whether there are sufficient historical analogues to disarm everyone else who merely possesses (either actually or constructively) both a controlled substance and a firearm. *Id.* at 481 n.24.

As in *Watkins*, we are faced with an as-applied challenge to Code § 18.2-308.4, which provides, "[i]t shall be unlawful for any person unlawfully in possession of a controlled substance classified in Schedule I or II of the Drug Control Act (§ 54.1-3400 et seq.) to simultaneously with knowledge and intent possess any firearm on or about his person." Code § 18.2-308.4(B). This statute results in a temporary loss of gun rights only when and where a person possesses a controlled substance simultaneously with the possession of a firearm.

Webb argues that the government failed to meet its burden to provide a historical analogue, and he argues that the three categories relied upon in *Watkins* are not appropriate analogues.[3] He further argues that this case is not controlled by *Watkins* because Webb, unlike the defendant in *Watkins*, has not admitted to being a current drug user. We disagree.

Our opinion in *Watkins* looked to three categories of historical regulations, which together constituted a sufficient historical analogue for purposes of the *Bruen* test. Though *Watkins* specifically considered possession of a firearm by a current drug user, and looked to historical regulations that disarmed the intoxicated and mentally ill, it was the combination of regulations that elucidated a broader principle—the United States has an "established tradition of disarming dangerous individuals." 83 Va. App. at 480. This same principle was evident in our

---

[3] The first step in the analysis is to ask whether the "the Second Amendment's plain text covers an individual's conduct." *Watkins*, 83 Va. App. at 467. In both *Ginevan* and *Watkins*, we assumed without deciding that the Second Amendment's text covered the proscribed conduct. We do the same here, and we address only whether the government met its burden of demonstrating a historical analogue to Code § 18.2-308.4.

analysis in *Ginevan*, where our review of historical regulations led us to the conclusion "that the English and American tradition of [the relevant] timeframes was to disarm people who were viewed as dangerous to the public or the stability of the government." *Ginevan*, 83 Va. App. at 25-26.

Code § 18.2-250 prohibits the possession of a controlled substance without a prescription. Thus, in cases such as this, where there is no prescription, there can be no lawful purpose for the possession of a controlled substance. Our decision in *Watkins* specifically outlines the dangers of allowing possession of a firearm by someone using illegal drugs, noting that those individuals "may be less stable than we rightfully expect those who possess and use guns to be." 83 Va. App. at 478 (quoting *Lewis*, 690 F. Supp. 3d at 1241).

Like in *Watkins*, the record before us establishes that Webb was in possession of a firearm at the same time he was in possession of a controlled substance.[4] Like the defendant in *Watkins*, Webb identified that substance as cocaine when questioned by the police.

Despite Webb's argument to the contrary, *Watkins* is more analogous than Webb would have us believe. Though the defendant in *Watkins* admitted to being a cocaine user, there is no evidence in the record that he was under the influence of a controlled substance at the time that he possessed both the firearm and the controlled substance.[5] Thus, essentially, the only difference between this case and *Watkins* is that the defendant here has not admitted to being a current drug user. Nonetheless, a person possessing both a controlled substance and a firearm

---

[4] These are the facts alleged at this point in the proceedings; we recognize, however, that the case is still at the pre-trial stage.

[5] While the opinion states that the defendant in *Watkins* was intoxicated, the evidence in the record indicates only that the defendant was under the influence of alcohol—not a controlled substance.

together is dangerous,[6] and even without the admission of current use, it falls within the broader principle recognized in *Watkins* and *Ginevan*—that the United States has a historical tradition of disarming the dangerous. By possessing both a controlled substance and a firearm, Webb falls within a class of people presenting a danger to society, falling directly within the rationale of our decision in *Watkins*. We find that our decisions in *Ginevan* and *Watkins* show that the right to bear arms does not include the right to possess firearms while simultaneously possessing a controlled substance—even when there is no admission of being a current drug user.

The test in *Bruen* requires us to look at "[w]hy and how the regulation burdens the right." *Watkins*, 83 Va. App. at 468 (quoting *Ginevan*, 83 Va. App. at 13). We find that the regulation here is passed for a similar purpose to the historical analogues set out in *Watkins*, and it imposes a similar burden. *See id.* ("In other words, a regulation passed for a similar purpose, and that imposes a similar burden, may constitute an appropriate analogue."). Code § 18.2-308.4(B) places a temporary restriction on the possession of a firearm, and it is limited to when an individual is possessing a controlled substance. The individual can reclaim or retain his or her right to possess a firearm by not possessing the controlled substance. Thus, we find that Code § 18.2-308.4(B) is constitutional as applied to Webb.

---

[6] The possession of a controlled substance, regardless of purpose, is a felony. *See* Code §§ 18.2-250, 18.2-248(C). While the Second Amendment protects the right to self-defense, it "does not give anyone the right to be armed while committing a felony." *United States v. Jackson*, 555 F.3d 635, 636 (7th Cir. 2009); *see also Bruen*, 597 U.S. at 2-3 ("The Second Amendment 'is the very product of an interest balancing by the people,' and it 'surely elevates above all other interests the right of *law-abiding*, responsible citizens to use arms' for self-defense." (emphasis added) (quoting *District of Columbia v. Heller*, 554 U.S. 570, 635 (2008))). Virginia has long recognized the danger and connection between illegal drugs and firearms. *See, e.g.*, *Bolden v. Commonwealth*, 49 Va. App. 285, 293 (2007) ("[T]he connection between illegal drug operations and guns in our society is a tight one." (quoting *Jones v. Commonwealth*, 272 Va. 692, 701 n.3 (2006))); *Thomas v. Commonwealth*, 44 Va. App. 741, 755 (recognizing "the commonsense 'relationship between the distribution of controlled substances . . . and the possession and use of dangerous weapons'" (alteration in original) (quoting *Logan v. Commonwealth*, 19 Va. App. 437, 445 (1994) (en banc))), *adopted upon reh'g en banc*, 45 Va. App. 811 (2005).

### III. CONCLUSION

For the foregoing reasons, we reverse the circuit court's decision, and we remand for proceedings consistent with this memorandum opinion.

*Reversed and remanded.*